### In re TAMPA CHAIN COMPANY, INC., Debtor,

### FUNDEX CAPITAL CORPORATION, Movant,

v.

### Barbara BALABER–STRAUSS, as Trustee for Tampa Chain Company, Inc., Respondent,

### Barbara BALABER–STRAUSS, as Trustee for Tampa Chain Company, Inc., Third-Party Plaintiff,

v.

### Wolf REICHARD and Rachel Reichard, Third-Party Defendants.

### Bankruptcy No. 83 B 11083.

United States Bankruptcy Court, S.D. New York.

Oct. 9, 1985.

---

Chester B. Salomon, P.C., by Alec Ostrow, New York City, for Fundex Capital Corp.

Kaye, Scholer, Fierman, Hays & Handler by Arthur Steinberg, New York City, for trustee.

Ballon, Stoll & Itzler by Philip Rogers, New York City, for Wolf and Rachel Reichard.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The Fundex Capital Corporation ("Fundex") seeks an order pursuant to § 725 of the Bankruptcy Code (the "Code") directing the trustee of Tampa Chain Company, Inc. ("Tampa Chain") to turn over to Fundex a portion of certain inventory proceeds in an amount sufficient to satisfy Fundex's secured claim, including attorney's fees, costs, and charges allowed under § 506(b). The trustee, in response, seeks a marshaling order requiring Fundex to first proceed against Wolf and Rachel Reichard as guarantors of Tampa Chain's debt to Fundex, and against the co-op supporting their guarantee, before proceeding against the debtor's estate. In the alternative, the trustee, pursuant to a complaint, seeks an order equitably assigning Fundex's rights to the collateral to the trustee in the event the trustee must satisfy Fundex's lien out of the debtor's estate. Trial was held on June 28 and July 1, 1985.

## I

Tampa Chain was founded some time prior to March 30, 1982 for the purpose of manufacturing jewelry. It started in business upon obtaining a working capital loan in the face amount of $194,760.00 from Fundex on that date. After deductions of $74,760.00 for interest at 20.85%, and of Fundex' legal fees and filing charges, Tampa Chain received net proceeds of $118,-086.50. The loan was secured by a security interest in all Tampa Chain's accounts receivables, inventory, tax refunds, machinery, and equipment. Written security agreements and Uniform Commercial Code financing statements were signed by Fundex and Tampa Chain and filed. Pre-Trial Order at 3–4.

The loan, however, was made, not on the strength of the collateral or in the expectation that Tampa Chain would successfully repay it, but on the protection afforded by the Reichard's mortgaging their three bedroom co-op to secure payment of their guarantee of the loan. As Howard Sommer, President of Fundex, determined at the time, Tampa Chain had no assets, other than a paltry $2,500.00 in a bank account, no operating history and no capital. He, therefore, approved the loan only upon receiving collateralized guarantees from the Reichards and after investigating a corporation known as M.C. Merchandising Inc. ("M.C."). Rachel and Wolf Reichard are shown, by a stockholder's consent form signed by them in 1982 in connection with the loan, to own 24% and 31% respectively of the issued and outstanding Tampa Chain stock. Joint Exhibit A item 4. Leslie Blond, Rachel Reichard's brother, was stated to own 25%.[1] Wolf Reichard and Blond were officers of both Tampa Chain and M.C. and owned all of M.C.'s issued and outstanding stock.

Fundex' investigation of M.C. revealed that the company was to be liquidated and that its record of business success was most tenuous. In the prior year, 1981, M.C. had incurred a 50% reduction in sales.

A Dunn and Bradstreet report commissioned by Fundex revealed to Sommer that M.C. had defaulted on an outstanding obligation and that the creditor had foreclosed on MC's collateral. Tr. at 16–17.

Despite these warning signals as to the financial strength of Tampa Chain and the operating history of its owners, Fundex agreed to make the loan to Tampa Chain after Sommer had inspected the Reichard's co-op and received the consent of the co-op board and concluded that the co-op had an estimated value of $300,000.00. Tr. at 33. At the same time the loan was executed, Fundex received confessions of judgment from both the Reichards, as well as their pledge of stock of the co-op. In the pledge agreement, the parties agreed that upon default on the loan, Fundex could demand that the Reichards immediately vacate the co-op and relinquish their possession of it, and that Fundex could resort to summary proceedings if necessary to evict them. Fundex also had the right upon default to sell the co-op by a sale of stock and an assignment of the lease. Joint Exhibit A, items 8–15. Consistent with its reliance on the Reichard's co-op for payment, Fundex did not determine if Tampa Chain bought the inventory or equipment it said it would buy with the loan proceeds, nor did it in any way monitor its operations. Tr. at 23.

Such a review in the first few months after the loan was made on March 30, 1982, although not required, would have revealed that its proceeds were largely diverted rather than used to obtain the machinery and inventory necessary for Tampa Chain to do business. By the end of June 1982, some 56% of the cash disbursements made by Tampa Chain (totalling $79,971.26) were to or for the benefit of Wolf Reichard, his wife's brother, his friends, or M.C. He used Tampa Chain money to buy jewelry machinery in his own name, Tr. at 75, 99, to pay off personal debts, Tr. at 136–137, to give money to friends and to pay off M.C. obligations. Trustee Post-Trial Exhibit 1. As a result, Tampa Chain, in the first four

---

1. Since these totals do not add up to 100%, it appears that the percentages given were in error, and not, as the Reichards assert, that Rachel Reichard was not a stockholder.

months of its brief life, had $23,000.00 in sales and had spent almost all of the $118,000.00 advanced by Fundex. Tr. at 108.

In explanation of this strange behavior, Wolf Reichard claims that his capital contributions to Tampa Chain greatly surpass any withdrawals he made. Third-Party Defendant Post-Trial Memo at 2. He, however, made no such contribution during the first three months after the Fundex loan was made, during which time large sums were being withdrawn for non-corporate purposes and only $23,000.00 collected. Tr. at 108; Trustee Exhibit 3B. Ultimately, Reichard contributed up to approximately $261,000.00 [2] Third-Party Defendant Post-Trial Memo at 2, and withdrew $82,459.55. Trustee Post-Trial Exhibit 2. But these later contributions did not right Tampa Chain's ship. Throughout its history Tampa Chain expended some $315,000.00 of its funds for the immediate benefit of Reichard, his brother-in-law Blond, and other companies owned by this family and to their ultimate benefit.

Principal among these was M.C. Established to performed metallic labor for manufacturers, Tr. at 109, and operating out of the same premises as Tampa Chain, M.C. did not sell jewelry directly to customers. During the later half of 1982, M.C. had transacted about $6,300.00 in business, Tr. at 129–130, and was to be liquidated gradually. Tr. at 63. Nonetheless, Tampa Chain sold $770,000.00 of gold chain, the bulk of its inventory, to M.C., on a special long term repayment schedule of 10 months, in contrast to the ordinary 1–3 months credit it gave to its other customers. Tr. at 143–144.

In justification of this transaction, it is asserted that M.C., through Leslie Blond, wearing his hat as an officer and shareholder of M.C. rather than his hat as officer and shareholder of Tampa Chain, told Reichard, in his Tampa Chain role, that it had a potential customer for this inventory.

Reichard also averred that Odena Marketing ("Odena"), the major creditor of Tampa Chain and supplier of the chains, knew of the customer, but carefully avoids claiming that Odena knew that of the transfer to M.C. Tr. at 144–147.

Rather than selling directly to the alleged customer, and despite the fact that M.C. did not ordinarily make such sales, Tampa Chain transferred the gold to M.C. The proposed sale did not occur, but M.C. did not transfer the inventory back to Tampa Chain. Instead, M.C. used it to secure a loan of gold material from which it would make chains. Tr. at 149–50, 158. Neither this gold material, the chains manufactured from it, nor the original Tampa Chain inventory were ever returned to Tampa Chain. Tr. at 141–159. While Reichard asserts that M.C. turned over the proceeds to Tampa Chain, he is hardly credible. The Tampa Chain books and records reflect no such receipt. Instead they reflect that Tampa Chain was left with a large receivable. Trustee Exhibit 4.

The end result of this transfer was a severely depleted Tampa Chain and a suddenly thriving M.C., which rebounded from the brink of insolvency in 1982 to the point of being able, in the early months of 1983, to run its own business as well as to make large "loans" of cash to Wolf Reichard, to pay other monthly maintenance charges for the Reichards' co-op, and to transfer money to his personal friends. Trustee Trial Exhibit 3F.

While Rachel Reichard's role in the use of Tampa Chain funds and comingling of its assets and personal funds hardly matches that of her husband, Tampa Chain paid nearly sixty thousand dollars to a pawn shop to redeem her personal jewelry. Tr. at 266–271; Trustee's Post Trial Exhibit 2 at 14. That benefit represented nearly half the Fundex loan amount and is tantamount to actually receiving a corporate

---

**2.** The trustee disputes various minor items reflected in this total, including $18,673.00 paid to Reichard which Reichard says who used to pay workers in March 1983. Since the employees paid worked at least in part for M.C. (Tr. at 222), Reichard also asserts that M.C. had no work at the time, even though it had received, shortly before, some $770,000.00 in gold from Tampa Chain. This assertion, as with the others he offers, simply lacks credibility.

check for personal use.[3] In addition, Tampa Chain paid some $5,783.00 of maintenance obligations on the co-op owned by her and her husband. Tr. at 127.

An involuntary Chapter 7 petition was filed on July 25, 1983 by Odena and two other creditors. *See In re Tampa Chain Co., Inc.*, 35 B.R. 568 (Bankr.S.D.N.Y. 1983). In September 1983, Tampa Chain defaulted on its installment payments to Fundex. An order for relief was entered on January 31, 1984 and Barbara Balaber-Strauss was named trustee. She holds $156,000.00 in proceeds realized upon selling Tampa Chain's remaining inventory of 19 kilograms of gold chain at public auction on or about December 12, 1984. Pre-Trial Order at 6–7.

This estate has approximately $200,-000.00 in its coffers consisting of the auction proceeds and a few other tangible assets. Tampa Chain's creditors hold claims in excess of $1,400,000.00. *Id.* at 7.

## II

■ The doctrine of marshaling applies where there is a common debtor of senior and junior creditors and the senior creditor alone has the right to resort to both a common fund and a separate fund. 2 J. Story, *Commentaries on Equity Jurisprudence* 230 (1884). Marshaling is intended primarily for the benefit of the junior creditor, who may lose his opportunity for repayment if the senior creditor is permitted to first exhaust the doubly-charged fund. As an equitable doctrine, it will not be ordered where the rights of the senior creditor will be compromised by its application. *Id.* at 247. The bankruptcy courts have long had the power to marshal the debtor's assets in order to effectuate on equitable distribution of funds to creditors of the debtor's estate. *See Meyer v. Unit-*

*ed States*, 375 U.S. 233, 236–237, 84 S.Ct. 318, 320–321, 11 L.Ed.2d 293 (1963).

### A. *The Trustee's Status as a Secured Creditor*

In opposing marshaling, Fundex and the Reichards first assert that such relief may not be ordered in favor of the Trustee because she is not a junior secured creditor as contemplated by the doctrine. Fundex Trial Memo at 9. In so asserting they rely on *In re Computer Room*, 24 B.R. 732, 735 n. 5 (Bankr.N.D.Ala.1982). Support for that position is also found in *Matter of McElwaney*, 40 B.R. 66, 10 C.B.C.2d 820 (Bankr.M.D.Ga.1984) (Trustee not allowed to invoke the marshaling doctrine by virtue of his status as a hypothetical lien creditor since to do so would frustrate the Code's general policy of leaving creditors in the status they enjoy under state law, by enriching unsecured creditors over secured creditors).

■ In providing a trustee with "the rights and powers of" an unsatisfied execution creditor as of the commencement of the bankruptcy case, however, § 544(a)(2) of the Code is a principal exception to that policy and not so limited. Neither the language of the statute nor its legislative history gives the slightest indication that Congress contemplated that such "strong arm" rights and powers are not to apply in a marshaling context.[4] By stepping into the "overshoes" of such a creditor, *In re Leichter*, 471 F.2d 785, 787 n. 4 (2d Cir. 1972), whether or not one exists, the trustee enjoys whatever rights and powers that status conveys under state law. *Cf. In re Consorto Construction Co.*, 212 F.2d 676 (3d Cir.) *cert. denied sub nom, Klein v. Equity Investment Co.*, 348 U.S. 833, 75 S.Ct. 57, 99 L.Ed. 657 (1954). In New York, an unsatisfied execution creditor has rights to the personal property of a debtor

---

3. This pledge appears to have been part of a series of pledges and redemptions from 1981–85. On March 1, 1984, after an order for relief was entered in this case, she repawned the jewelry, Tr. at 271, apparently for the benefit of M.C. Tr. at 266.

4. The argument of Fundex' counsel to the contrary is erroneously attributed to the court on page 323 of the transcript commencing at line 16. *See* Tr. at 326 for response of counsel to the Trustee to that argument.

served with a writ of execution superior to all but prior secured creditors and bona fide purchasers for value. N.Y.Civ. Prac.Law § 5202(a) (McKinney 1978). The Trustee is thus to be deemed a secured creditor.

### B. *Common Debtor*

Requiring more analysis is the assertion that marshaling may not be ordered in a case involving a corporation and its shareholders who guarantee a corporate loan since there is no debtor that holds both funds.

■ Marshaling has traditionally required that both sources of payment belong to a common debtor. Ordinarily, this requirement is not met where the two funds sought to be marshaled are held separately by a corporation and its shareholder even though he guaranteed corporate debt. *Farmers & Merchants Bank v. Gibson*, 7 B.R. 437, 440 (Bankr.N.D.Fla.1980); 55 C.J.S. *Marshaling Assets and Securities*, § 6 (1948); 2 *Story* at 246.

In certain instances, a different result has been reached. Several courts have held that when a guarantor who is also a controlling shareholder provides the lender with the primary collateral needed to obtain a working capital loan to either initiate or continue the operation of the debtor corporation, the "common debtor" requirement is satisfied and the equitable remedy of marshaling is available. *Compare In re Jack Green's Fashions for Men-Big and Tall, Inc.*, 597 F.2d 130 (8th Cir.1979); *In re Multiple Services Industries, Inc.*, 18 B.R. 635 (Bankr.E.D.Wisc.1982); *Gibson*, 7 B.R. at 440–441 (secured creditor required to look to property collateralizing guarantee) *with In re Computer Room*, 24 B.R. at 735 n. 4; *Stuhley v. United States*

*Small Business Administration (In re United Medical Research, Inc.)*, 12 B.R. 941, 943 (Bankr.C.D.Cal.1981) (denying marshaling merely because secured creditor supplied working capital). Under such circumstances, the collateral pledged by the guarantor/shareholder is held, by those courts permitting marshaling, to be the equivalent of a capital contribution to the corporation which a court in equity should consider as a fund for the corporation itself, so that there is a "common debtor". *Gibson*, 7 B.R. at 441.

Of more widespread acceptance is the notion that where the corporate veil should be pierced upon the application of traditional doctrine, equity will subject the property of individual shareholders to the claims of corporate creditors thereby satisfying the "common debtor" requirement for marshaling. *E.g., Gibson* 7 B.R. at 440.[5] Pursuant to that doctrine, the corporate veil will be disregarded in fraud, inadequate capitalization and alter ego cases. *See In the Matter of Seatrade Corporation*, 255 F.Supp. 696 (S.D.N.Y.), *aff'd sub nom. Chemical Bank New York Trust Company v. Kheel*, 369 F.2d 845 (2d Cir.1966); *Brunswick Corp. v. Waxman*, 459 F.Supp. 1222 (E.D.N.Y.1978); R. Hamilton, *The Law of Corporations*, § 6.4 (1980); Cataldo, *Limited Liability with One Man Companies and Subsidiary Corporations*, 18 Law & Contemp.Prob. 473 (1953); *Note*, 45 Harv.L.Rev. 1084 (1932).

■ Neither the *alter ego* theory nor the inadequate capitalization doctrine applies here. Books and records distinguishing the debtor's assets from those of the Reichards were maintained. *See Cataldo*, at 484. While it may have been undercapitalized after three months, there is little evidence that the debtor remained so once

---

**5.** Indeed, those cases denying marshaling in the absence of such conduct have recognized the general availability of the remedy where the corporate veil is to be pierced. *Dupage Lumber & Home Improvement Center v. Georgia-Pacific Corp.*, 34 B.R. 737 (N.D.Ill., 1983); *United States v. Friend (In re A.E.I. Corp.)*, 11 B.R. 97, 7 B.C.D. 876, 4 C.B.C.2d 890 (Bankr.E.D.Pa.1981) (no intermingling of funds between debtor and share-

holder/guarantor); *McDonald v. First National Bank of Athens (In re Harrold's Hatchery & Poultry Farms)*, 17 B.R. 712, 716–717 (Bankr.M. D.Ga.1982) (no evidence to justify piercing the corporate veil); *Stuhley*, 12 B.R. at 943–944 (no inequitable conduct); *Whirlpool Corp. v. Plad, Inc. (In re Plad, Inc.)*, 24 B.R. 676, 679 (Bankr.M. D.Tenn.1982) (no intermingling).

Wolf Reichard commenced contributing fairly large sums to its capital. We are similarly reluctant to find a "common debtor" merely through a lender's supplying working capital pursuant to a loan collateralized by a debtor's assets merely because a guaranty was also collateralized by personal assets as in *Jack Green's Fashions* and *Multiple Services.* That doctrine has been criticized, *inter alia,* as a deterrent to new corporate enterprise that spurs technological and economic growth. *See Stuhley,* 12 B.R. at 943; *In re Computer Room,* 24 B.R. at 735 n. 4, and authorities noted therein. Whether *Jack Green's Fashions* will gain acceptance in light of that criticism remains to be seen. We need not reach that issue in this case, where the senior creditor looked to the collateral for the guaranty of the loan for protection and where the evidence amply demonstrates highly inequitable conduct by the shareholders/guarantors.

Even those cases refusing to marshal assets in the case of a corporate loan guaranteed by a principal in the absence of a common debtor have suggested that finding a common debtor would be appropriate in cases of inequitable conduct, overreaching or fraud. *Dupage,* 34 B.R. at 742; *McDonald,* 17 B.R. at 717; *Stuhley,* 12 B.R. at 944. The *Stuhley* court, most critical of *Jack Green's Fashions* and its forebearers, recognized that the true concern with respect to the principal is whether his claim, upon fulfilling his guarantee, would be subordinated to general creditors. *Stuhley,* 12 B.R. at 944. "On principle there is no difference between a stockholder loan to a corporation and that stockholder loaning his credit to the corporation by securing his guarantee of a corporate debt with individual assets." *Ibid.*

Finding a common debtor, as noted in *Stuhley,* has the effect of first liquidating the collateral posted by the corporate principals and requiring them to share equally with or be subordinated to other creditors upon subrogation. Equitable subordination, as a companion doctrine of the disregard of the corporate veil, lies where the principal(s) engaged in fraud or other inequitable conduct to the harm of creditors or an unfair advantage to the claimant and is not contrary to principles of bankruptcy law. *Pepper v. Litton,* 308 U.S. 295, 309–310, 60 S.Ct. 238, 246–247, 84 L.Ed. 281 (1939); *Taylor v. Standard Gas & Elec. Co.,* 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669 (1939); *In re Multiponics, Inc.,* 622 F.2d 709, 713 (5th Cir.1980); *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977); A. DeNatale & P. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 Bus.Lawyer 417, 423 (1985).

> Inequitable conduct is that conduct which may be lawful, yet shocks one's good conscience. It means, *inter alia,* a secret or open fraud, lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by bon chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct.

*In re Harvest Milling Co.,* 221 F.Supp. 836, 838 (D.Or.1963) (quoted with approval in DeNatale & Abram, 40 Bus.Lawyer at 424, n. 35).

Here, the elements of inequitable conduct and fraud justifying disregard of the corporate veil or requiring equitable subordination are clearly present. While corporate formalities and records are evidenced, they show continuous use of Tampa Chain as a personal piggy bank from which the Reichards withdrew much of Tampa's initial capitalization, replenished it through depositing Wolf Reichard's own funds, and from which he transferred some $770,000.00 in inventory to another family owned company on hardly commercial terms. This is hardly a case of business acumen. It is a case of abuse of corporate funds. Further, the transfer to M.C. bears several of the badges that have traditionally demarked fraud. Just as "[t]he shifting of assets by the debtor to a corporation wholly controlled by him is [a] ... badge of fraud," *Salomon v. Kaiser (In re Kaiser),*

722 F.2d 1574, 1583 (2d Cir.1983), *citing Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941), the transfer to M.C. may not be characterized as anything less. Other badges of fraud also condemn it. They include:

    1. the lack or inadequacy of consideration;

    2. the family, friendship or close association relationship between the parties;

    3. the retention of possession, benefit or use of the property in question;

    4. the financial condition of the party sought to be charged before and after the transaction in question; ...

*Kaiser*, 722 F.2d at 1582–83. While "[f]raudulent acts are as varied as the fish in sea", *Id.* at 1583, the transfer to M.C. was an ordinary fraud, the intent of which was obvious. *Cf. A.E.I.*, 11 B.R. at 100; *McDonald*, 17 B.R. at 717; *Stuhley*, 12 B.R. at 944; *Plad*, 24 B.R. at 679.

In apparent recognition of this evidence, Fundex makes no attempt to defend Wolf Reichard's conduct. Rather, it, in its post trial brief, seeks solace in the assertions that there is less evidence to connect Rachel Reichard with this course of dealing, that Wolf Reichard testified that she was not a shareholder and that marshaling should not be ordered since she owns the co-op with her husband as tenants by the entirety.

This position is without merit. The Fundex loan documents state that she was one of three shareholders and Reichard's unvarnished testimony that she was not is simply not credible. Furthermore, she benefitted from some of these transactions directly and not merely through her husband. The redemption of her personal jewelry with $60,000.00 of Tampa Chain funds and the payment by Tampa Chain of sums she and her husband owed with respect to the co-op are sufficient, under the doctrines noted above, to subject her interest in the co-op to marshaling. To this is to be added the use of Tampa funds to pay $5,783.00 with respect to the co-op, and that some of the proceeds of the $770,000.00 in gold sold to M.C. were used for that purpose as well. Tampa Chain may well have thus obtained an equitable interest in the co-op. For all these reasons the common debtor requirement is satisfied.

To this is to be added the notion that Fundex will hardly be prejudiced by having first to resort to the co-op to satisfy its claim. To be sure, it is a traditional canon of the marshaling doctrine that the senior creditor will not be required first to proceed against the singly charged fund (the Reichard co-op) if foreclosure is required where the doubly-charged fund (the proceeds held by the Trustee) is more directly available by being easily reduced to money. 2 *Story* 232 n. 4. It has since come to be recognized by some courts that marshaling can, nevertheless, be ordered where there is no evidence of difficulties in foreclosing that were unanticipated by the senior creditor at the time the loan was made and which now prejudice its interest or unduly delay satisfaction of its claim. *United States v. Le May*, 346 F.Supp. 328, 330 (E.D.Wis.1972); *In re Multiple Services Industries, Inc.*, 18 B.R. at 637. This rationale applies here, where Fundex has shown no difficulty or delay in satisfying its claim from the co-op. To the contrary, its president had instructed its attorneys to proceed against the Reichards and was under the impression that they had. Tr. at 38. Moreover, Fundex, in pressing that action, has available to it speedier remedies than the foreclosure process. It can demand that the Reichards immediately vacate and relinquish possession of the co-op. If necessary, Fundex can commence summary proceedings to evict them. Fundex can also sell the co-op by selling the stock and assigning the lease at a private or public sale. Joint Exhibit A, item 15.

Furthermore, it will not be prejudiced because it will remain at all times fully collateralized. Fundex has asserted that the total due on June 30, 1985, is $121,-532.00. Fundex Exhibit 2. The Tampa Chain estate is presently worth approximately $200,000.00. Fundex will incur no risk to its interest when foreclosing on the

co-op, because the trustee has explicitly convenanted to set aside funds of the estate in "an amount equal to the Fundex debt in the event Fundex is unsuccessful in foreclosing on the Reichard Coop ... or if the coop does not yield a sufficient amount to pay the Fundex debt in full." Trustee's Pre-Trial Memo at 9–10. In addition, the relief here should be structured so that should Fundex encounter difficulties in realizing upon the co-op, it can, as the court ordered in *Gibson*, 7 B.R. at 443, then be repaid from the proceeds and its claim against the co-op be subrogated in favor of the trustee. In the meantime, since Fundex is accruing interest on its loan at a rate of 20.875%, Pre-Trial Order at 4, its financial interest is safeguarded and will not be prejudiced while it takes the limited steps necessary to secure the co-op. *See In re Multiple Services Industries, Inc.*, 18 B.R. at 637; *cf. McElwaney*, 40 B.R. at 72 (marshaling denied where it would result in unsecured creditors being enriched at the expense of secured creditors).

### III

The exact amount of the debt owed Fundex is also disputed. The Trustee claims that a payment due in September 1983 was made by Reichard from his personal funds or by M.C. and that it, pursuant to a March 30, 1982 letter agreement is entitled to credit for unearned interest. She further disputes Fundex' claim for late charges. Fundex asserts that the payment was not received and observes that the March 30 agreement provides for termination of the right of prepayment on default. The Trustee further challenges Fundex' claim for legal fees.

### A. *The Amount of the Debt*

Fundex asserts that it is owed $121,-532.00. In calculating that sum, it admits receipt of 25 monthly payments from April 1982 through August 1983, for October and November 1983 and for March, May, June, July, August and September 1984. It claims not to have received payments for September and December 1983 and January, February, and April 1984 and accelerated payments due in October 30, 1984. These total $113,610. To this it adds past due interest of $7,922.00.

As to whether the September 1983 payment was made, the trustee asserts that Wolf Reichard so testified, that Fundex records show that the payment was not received but bear the notation "lost by bank", and that M.C.'s records reflect an August 1983 payment to "Foundex." Reichard's testimony as to the September 1983 payment is, however, confused. He testified that the payment might have been made from his own personal account, but "[i]t could be that I didn't make it." Tr. at 183–94. He further testified that Fundex called him when it was due. Fundex's notation is at best ambiguous. Presumably it would reflect what Reichard told them when they called regarding the payment. The M.C. entry, by itself, is hardly reliable evidence that this payment was made. Consequently, the Trustee has failed to establish by a preponderance of the credible evidence her defense of payment.

Similarly, the repayment credit claimed by the Trustee cannot be sustained since the right was contractually terminated upon default. Joint Exhibit A, item 7. Thus, we need not address the question of whether certain penalty charges that would accrue upon prepayment amount to fourth priority penalty under § 726(a)(4) of the Code.

As to the interest of $7,922.00 claimed, it appears that those charges are calculated on the basis of a provision in the promissory note providing:

> This Note shall not bear interest except that post-maturity interest shall accure and be payable at the rate of 2% per month on each installment due hereunder not paid when due.

Since interest had already been factored into the face amount of the loan, the interest now sought by Fundex is for late charges. They are thus a penalty. *In re Hawks*, 471 F.2d 305 (4th Cir.1973); *In re Tastyeast, Inc.*, 126 F.2d 879, 882 (3d Cir.),

*cert. denied*, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942). Such penalties are not recoverable under § 506(b) of the Code for the reasons set forth in *In re Ireson*, 48 B.R. 711, 713–14 (Bankr.W.D.Va.1985). Under the former Bankruptcy Act, penalties were not allowable. *Tastyeast*, 126 F.2d at 882. In a Chapter 7 case under the Code, claims for penalties, whether secured or unsecured, to the extent that they "are not compensation for actual pecuniary loss suffered by the holder of such claims" are accorded a fourth priority in distribution behind full payment of all other claims except post petition interest. While one might argue that § 726(a)(4) implies that penalties that do reflect compensation for pecuniary loss should be permitted under § 506(b) for secured claims or under § 726(a)(2) for unsecured claims, Fundex has offered no proof of such actual loss. Its charges of interest in the amount of $7,922.00 cannot, therefore, be sustained.

### B. *Attorneys Fees*

Section 506(b) does enable an oversecured creditor to include in its secured claim "any reasonable fees ... provided for under the agreement under which such claim arose." Here the promissory note obligates the debtor, if an installment "is not paid when due and is placed with an attorney for collection" to "pay all costs of collection, including reasonable attorneys fees (which is agreed shall be at least 20% of the then outstanding obligations)." The parties agree that, notwithstanding the parenthetical clause, this Court is to establish the reasonableness of the fee. Tr. at 5. They disagree over whether the fees incurred by Fundex in making a motion to vacate the automatic stay provided by § 361 of the Code and for pressing the

instant motion are compensible under the Code. The Trustee has not disputed Fundex' proffer of the reasonableness of its attorney fees and hourly rate. She does dispute whether the fees were reasonably incurred to protect Fundex' interests.

■■■ With regard to the stay motion, there is simply no evidence of reasonableness. In their briefs, Fundex and the Trustee press certain equities which they say existed at the time. Neither side supported their position with proof.

■■■ As to the instant proceeding, its substance was to recover the proceeds held by the Trustee upon selling the collateral for the loan. It thus falls within the term "collection" as that term has been interpreted in this circuit for it was intended to protect Fundex' interests. *See, In re United Merchants & Mfrs. Inc.*, 674 F.2d 134 (2d Cir.1982); *James Talcott, Inc. v. Wharton (In re Continental Vending Machine, Inc.)*, 543 F.2d 986 (2d Cir.1976).[6] That it, in so doing, resisted the Trustee's assertion of marshaling does not change the posture of the proceeding. Fundex was still "collecting" its debt.[7] It might have been wiser to first proceed against the Reichards while preserving its position here. But it was not so unreasonable for Fundex to press its claim as in *In re Nifcur-Cruz Realty Corp.*, 50 B.R. 162 (Bankr.S.D.N.Y. 1985) and *In re B & J Harris, Inc.*, 5 B.R. 686, 687, 6 B.C.D. 854, 2 C.B.C 2d 1044 (Bankr.M.D.Fla.1980). While its status as a secured creditor may not have been in jeopardy, the immediacy of its ability to proceed against the collateral held by the Trustee was. That is enough of an interest

---

**6.** The Trustee also relies on *In re Wiltwyck School*, 34 B.R. 270, 11 B.C.D. 265 (Bankr.S.D.N.Y.1983). The agreement there excluded the fees sought. That is not true here.

**7.** The Trustee also asserts that this matter can not be a collection case since it was not brought under Rule 7001 of the Rules of Bankruptcy Procedure but rather by motion to enforce § 725 of the Code. It is now established that an action by a secured creditor to obtain its collateral should be brought by summons and com-

plaint pursuant to Rule 7001. *In re L.G. Edwards Farm, Inc.*, 30 B.R. 842, 844 (Bankr.E.D. Mo.1983). But the Trustee acquiesced in the procedure adopted here even to the extent of bringing in the Reichard's as defendants, engaging in discovery and proceeding to trial. She should not now, at the end of the road, complain solely for the purpose of defeating a contractual obligation, that the wrong vehicle was employed to traverse it.

to justify its acts under the authorities noted above.

Upon the foregoing facts and conclusions of law, the Fundex debt should be fixed at $113,610.00, plus attorneys fees as noted and it is directed to proceed first against the Reichard's co-op under the protections noted above.

Settle order in conformity with this Opinion.