In re Fred H. BAME, ASF/AL & Alma's, Inc., ASF/Excelsior Park Tavern Two, Inc., ASF/Excelsior Financial Properties, ASF/Gopher Oil Company, Debtor.

**James E. Ramette, Trustee, Plaintiff,**

v.

**United States and Minnesota Department of Revenue, Defendants.**

Bankruptcy No. 99-40683.
Adversary No. 01-4130.

United States Bankruptcy Court, D. Minnesota.

Dec. 21, 2001.

T. Jay Salmen, Holmes & Graven Chtd., Minneapolis, MN, Thomas F. Miller, Minneapolis, MN, for debtor.

G. Martin Johnson, Bloomington, MN, for petitioning creditors.

Thomas J. Flynn, Bloomington, MN, Randall L. Seaver, Fuller Seaver & Ramette PA, Burnsville, MN, Richard L. Morris, Morris Carlson & Hoelscher PA, Minneapolis, MN, Clare A. Brunetta, Canada, for trustee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for trial before the undersigned on the 30th day of October. Appearances were as noted on the record. The court has heard and considered the evidence and makes the following:

### FINDINGS OF FACT

JoAnna Bame ("JoAnna") and Fred H. Bame ("Debtor") are husband and wife. At the time of their marriage JoAnna owned the property located at 5110 Meadville, Excelsior (Greenwood), Minnesota 55331 ("the property"). The property consists of a log-home residence located on a lot with 237 feet of shoreline on Lake Minnetonka. In June of 1992, JoAnna quitclaimed the property to Debtor and herself as joint owners. The deed was recorded in Hennepin County on August 5, 1992. Debtor suffered severe financial losses in the mid 1990's. By quitclaim deed recorded on March 16, 1998, JoAnna and Debtor conveyed the property back to JoAnna.

At or about the same time, Debtor engaged in a number of other transfers of property to JoAnna for little or no consideration. Debtor was the sole owner of real property in Ontario, Canada, known as the Hook 'n Horn Resort ("resort") and a brokerage account at Union Securities Ltd. ("Union"), a Canadian brokerage. In May 1998, Debtor transferred the resort to JoAnna for one dollar. Debtor also transferred securities from the Union account to a "Hook 'n Horn Camp" account to which both JoAnna and Debtor were signatories.

On February 16, 1999, within a year of these transfers, this bankruptcy case was commenced as an involuntary Chapter 7. The case was then converted to a Chapter 11 proceeding and converted back to a Chapter 7 on May 19, 1999. Plaintiff James Ramette ("Trustee"), was appointed to administer the bankruptcy estate. JoAnna was the sole owner of the property at the time of filing and she remains such to this day.

The following liens encumber the property:

a. A mortgage from JoAnna and Debtor dated July 11, 1995, in the amount of $1,207,120 in favor of Bank of America, recorded in Hennepin County on August 4, 1995 with a balance as of October 31, 2001, in the amount of $1,309,079.64.

b. A federal tax lien filed on October 8, 1997, by the Internal Revenue Service ("IRS") against Debtor in the amount of $121,699.43.

c. Tax liens recorded by Minnesota Department of Revenue ("MDOR"), notices of which were filed on the following dates:

| | | |
|---|---|---|
| 2821828 | $10,099.75 | June 26, 1997 |
| 2834850 | $10,006.40 | August 8, 1997 |
| 2863857 | $20,414.06 | October 15, 1997 |
| 2879489 | $51,755.19 | January 16, 1998 |
| 2885715 | $ 8,585.02 | February 6, 1998 |

d. A mortgage filed November 6, 2000 from JoAnna in favor of Republic Leasing Corporation in the amount of $85,000.

MDOR filed a proof of claim in this bankruptcy case, asserting an unsecured priority claim for unpaid taxes of $172,048.92. Of this amount, $100,860.42, plus interest, reflects Debtor's Minnesota state tax liabilities which accrued between

August of 1992 and March 16, 1998, during which time Debtor had a recorded interest in the property. The total amount due as of October 30, 2001 is $152,439. The IRS has also filed a proof of claim in this case asserting an unsecured priority claim in the total amount of $136,720.68. The total amount due to the IRS as of October 30, 2001 was $170,824.04. No objection to these claims have been filed and each is, accordingly, allowed. Those claims are unsecured claims in this case because at the time of the filing Debtor had no interest in the property. They are, however, more than amply secured by the property now in JoAnna's name.

On June 29, 2001, Bank of America issued a Notice of Mortgage Foreclosure Sale on the property, but it subsequently canceled the foreclosure proceeding because the Trustee was pursuing a preference claim against the bank which action created uncertainty in calculating the mortgage reinstatement amount. None of the lienholders has otherwise acted to foreclose its lien on the property.

Real estate taxes on the property for the year 2001 were $19,265.06. These taxes have been paid. The amount of property taxes for the year 2002 has not yet been determined. The 2002 payment will be due as follows: one-half on or before May 15, 2002, and the other one-half on or before October 15, 2002. When real property is sold in the State of Minnesota, the seller is customarily responsible for the pro-rata share of the taxes through the closing date.

On June 7, 1999, the Trustee commenced an adversary proceeding against JoAnna seeking to avoid the various pre-petition transfers of property Debtor had made to JoAnna. On January 27, 2000, JoAnna and the Trustee entered into a Settlement Agreement and Mutual Release ("settlement") resolving these claims.

An Order approving the settlement was filed on March 2, 2000. The settlement required JoAnna to pay the Trustee the sum of two hundred fifty thousand and 00/100 dollars ($250,000) as follows: $195,000 in two interest-free installments, and the remaining balance of $55,000 from proceeds from the sale of the property. The settlement required JoAnna to place the property on the market and use all commercially reasonable efforts to close the sale on or before September 1, 2000. JoAnna also agreed to pay the tax liens from the proceeds of the sale of the property. She did not assume any obligation to pay the tax liens independent of such sale. She paid the Trustee the two installment amounts, but she has not paid the last installment, sold the property, nor paid the tax liens.

The property is the home of JoAnna and Debtor. It is located on Lake Minnetonka, in what is perhaps the most prestigious residential setting in the state. It is divisible into two distinct parcels: an empty lot with about 100 feet of shoreline on the lake and the contiguous parcel with approximately 137 feet of such shoreline on which the log home is currently located.

The property has been actively marketed since the Spring of 2000. The original listing price was $3.9 million. Since then the listing price has been reduced to approximately $3 million. The real estate agent has expended extensive efforts to sell the property. He spent approximately $40,000 in advertising expenses in his efforts to sell the property, an amount he described as typical for properties of this value and in this location. He and other realtors have shown the property many times to potential buyers. A sales contract with a potential buyer for the lot was entered into on December 5, 2000, but, because of difficulties not related to its value, a sale did not result. No other

offers have been received. The agent estimates that the time period to sell this rather unique home could range up to four years, due to the fact that it is not a traditional piece of real estate and only a few high-income individuals can afford it. Marketing has been hampered by the existence of this bankruptcy and a pending lawsuit against the first mortgagee which must agree to any separate sale of the undeveloped lot and which has not been cooperating.

There are actually several different ways to market the property. The realtor testified that it could be marketed as one unit, is divisible into a separate empty lot and a lot with a structure, or even as a property suitable for purchase as one unit and "tear down." He also testified that he has known of Lake Minnetonka sales where properties with structures and values close to $4 million were purchased for tear down purposes. The land is so valuable, the structures are viewed as not worthy of saving. He further testified that he would expect the property to sell for $2.5 million if it had no house on it. Because of its construction features, tear down costs would be expensive, running around $100,000.

On June 12, 1995, the property was appraised in connection with a mortgage granted to Bank of America at $1,507,200. The Hennepin County Assessor's office appraised the property effective January 2, 2001, at $1,641,000 (land $1,260,000; structure $381,000). At trial, Plaintiff's expert testified that the property had a fair market value of $2.8 million with the empty lot valued at $1 million and the home and second lot valued at $1.8 million. No contrary expert valuation testimony was offered by Defendants. Thus, after payment of the first mortgage there is approximately $1.5 million in equity in the property.

Creditors have filed over $4.5 million in claims in this case, including the claims of Bank of America and the Defendants. The Trustee has aggressively administered this estate and through his efforts currently holds approximately $1 million in his account for payment of such claims. If I do not require Defendants to pursue collection against JoAnna's property before seeking to collect their claims as unsecured creditors in the bankruptcy case, JoAnna will keep her $1.5 million in equity and unsecured creditors, other than Defendants, will see their potential pot of recovery reduced from $1 million to around $700,000.

The cost of a judicial foreclose and sale of the property to the United States would be approximately $10,936, including personnel costs owing out of expenditure of time by IRS employees of $10,041. The cost of redemption and sale of the homestead from a mortgage foreclosure to the United States would be approximately $1,790. The cost to the United States of maintaining the homestead until it could be sold in either a judicial foreclosure and sale or a redemption and sale would be about $800 per month.

The MDOR estimates that if it is required to redeem in a foreclosure situation the redemption costs would be $1,559,000, which figure includes, *inter alia*, some $1,400 in employee costs of MDOR personnel. MDOR estimates its costs to carry the property between redemption and sale at $15,600 per month, a figure which includes accruing interest on the redemption amount, taxes, insurance, MDOR employee costs and utilities, maintenance and upkeep. Should MDOR be required to evict JoAnna and Debtor, costs would be about $4,000.

The Trustee's complaint in this case seeks the following relief: 1) avoidance of any United States or MDOR tax lien

against the $195,000 in settlement proceeds relating to the Hook 'n Horn Resort in Canada; 2) a declaratory judgment that the Debtor's securities held in the Union Securities, Ltd. account and the settlement proceeds thereof are not subject to any United States or MDOR tax lien; and 3) an order requiring the United States and the MDOR to satisfy tax claims against the bankruptcy estate by proceeding first against the property. Defendants concede items (1) and (2). Accordingly, judgment in favor of the Trustee is to be entered on these claims. This leaves for resolution only the issue of whether the MDOR and IRS will be required to marshal assets by proceeding against the property before making claim to the pool of assets available to unsecured creditors.

## CONCLUSIONS OF LAW

### 1. The Effect of the Liens

■ The Internal Revenue Code's levy and seizure provisions are available to the IRS to protect and satisfy its liens and are analogous to the remedies available to private secured creditors. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 210–211, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). These provisions include section 6321 which provides a lien for unpaid taxes in favor of the United States on all property of the taxpayer. I.R.C. § 6321. Section 6323(f) provides for the filing of tax liens and section 6331 empowers the Internal Revenue Service to collect taxes by levying on the property of a person who neglects or refuses to pay any tax on which there is a lien. I.R.C. §§ 6323(f), 6331. The IRS can also enforce its liens and sell the property under section 7403 even where title is currently held by JoAnna, a non-debtor spouse.[1] I.R.C. § 7403; *see United States v. Rodgers*, 461 U.S. 677, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983); *United.States v. Bierbrauer*, 936 F.2d 373 (8th Cir.1991).

■ Although state law places greater restrictions on the MDOR than federal law places on the IRS, the MDOR is empowered to collect its tax liens as to the property. Essentially, Minnesota law accords tax liens the status of a judgment lien. *Girard v. Michener (In re Michener)*, 217 B.R. 263, 270 n. 6 (Bankr.D.Minn.1998). The parties agree that the state tax liens are valid and continue to encumber the property. The state tax liens arise by virtue of Minnesota law, which provides, in relevant part:

> The tax imposed by any chapter administered by the commissioner of revenue, and interest and penalties imposed with respect thereto, including any recording fees, sheriff fees, or court costs that may accrue, shall become a lien upon all the property within this state, both real and personal, of the person liable for the payment or collection of the tax ... from and after the date of assessment of the tax.[2]

MINN. STAT. § 270.69(1)(2001).

The state's procedure for the execution and sale of the property is governed by

---

1. The IRS may obtain enforcement of a federal tax lien by filing a lien foreclosure suit. Specifically, the Attorney General, at the request of the Secretary of the Treasury, may institute a civil action in federal district court "to enforce the lien of the United States ... or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability." I.R.C. § 7403(a). A court may "determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, [the court] may decree a sale of such property ... and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States." I.R.C. § 7403(c).

2. Minnesota Statutes section 270.65 provides:

section 270.70 subdivision 3 which provides, in part:

> In making the execution of the levy and in collecting the taxes due, the commissioner shall have all of the powers provided in chapter 550 and in any other law for purposes of effecting an execution against property in this state. The sale of property levied upon, and the time and manner of redemption therefrom, shall, to the extent not provided in sections 270.701 to 270.709, be governed by chapter 550. The seal of the court, subscribed by the court administrator, as provided in section 550.04, shall not be required. The levy for collection of taxes may be made whether or not the commissioner has commenced a legal action for collection of such taxes.

MINN. STAT. § 270.70 subd. 3 (2001)

■ Under Minnesota law, the MDOR may not collect against a homestead. See MINN. STAT. §§ 270.69(10), 510.01 (1990 & Supp.1998). However, that restriction only prevents collection from JoAnna's $200,000 equity in the property, but does not prevent the MDOR from collecting from the remaining equity in the property. See *Kipp v. Sweno*, 629 N.W.2d 468 (Minn. Ct.App.2001)(forced sale allowed subject to homestead exemption amount). In this case, it is unlikely that the MDOR will need to force a sale. If the property is not sold, either the IRS, pursuant to this order, or the mortgage company will foreclose and the MDOR will be able to redeem if necessary to collect the taxes owed. *See* MINN. STAT. § 580.24 (1996).

The *Rodgers* case enumerates factors effecting how the United States exercises its collection powers against the non-debtor spouse's homestead, including the extent of the spouse's homestead exemption under state law, the feasibility of a partial sale, the expectations of the non-debtor spouse that the property would be the subject of a forced sale, the non-debtor spouse's dislocation costs, and the nature and extent of the non-debtor spouse's interest in the property. *Rodgers*, 461 U.S. at 709–710, 103 S.Ct. 2132.

None of the factors in *Rodgers* would prevent a forced sale of the property. First, substantial equity remains in the property after deducting the mortgage indebtedness and the full $200,000 homestead. JoAnna would be entitled to payment of $200,000 and would not lose the benefit of the exemption. MINN. STAT. § 510.02; *cf. Westinghouse Credit Corp. v. Central Trust Co. (In re Leonardo)*, 11 B.R. 453, 455 (Bankr.W.D.N.Y.1981)(marshaling not imposed where debtor would be denied benefit of homestead).

Second, as the non-debtor spouse, JoAnna has been on notice that the property could be the subject of a judicial sale to satisfy the tax liens. She took title to the property after the tax liens had attached. Subsequently in the settlement, she agreed to make a good faith effort to sell the

---

[T]he term "date of assessment" means the date a liability reported on a return was entered into the records of the commissioner or the date a return should have been filed, whichever is later; or, in the case of taxes determined by the commissioner, "date of assessment" means the date of the order assessing taxes or date of the return made by the commissioner; or, in the case of an amended return filed by the taxpayer, the assessment date is the date additional liability reported on the return, if any, was entered into the records of the commissioner; or, in the case of a check from a taxpayer that is dishonored and results in an erroneous refund being given to the taxpayer, remittance of the check is deemed to be an assessment and the "date of assessment" is the date the check was received by the commissioner.

MINN. STAT. § 270.65 (2001)

property and agreed to apply the proceeds to satisfy the tax liens,

> A court should consider whether the third party with a non-liable separate interest in the property would, in the normal course of events ... have a legally recognized expectation that separate property would not be subject to forced sale by the delinquent taxpayer or his or her creditors. If there is no such expectation, then there would seem to be little reason not to authorize the sale.

*U.S. v. Rodgers*, 461 U.S. at 709, 103 S.Ct. 2132. Considering the timing and circumstances under which JoAnna acquired full title from the Debtor, and the terms of the settlement, JoAnna has no reasonable expectation that the property would not be sold to satisfy the tax liens filed against it. The equitable considerations discussed in *Rodgers* support the imposition of marshaling and the foreclosure of the property to satisfy the Defendants' tax liens. Neither the MDOR or the IRS is being placed in a different position than it was before the bankruptcy. The single asset to which their liens attach is the property and it is against the property that, in equity, they should first seek to collect.

### 2. The Doctrine of Marshaling

■ The equitable doctrine of marshaling "rests on the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor, who may resort to only one of the funds." *Meyer v. United States*, 375 U.S. 233, 236, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963)(*quoting Sowell v. Federal Reserve Bank*, 268 U.S. 449, 456—457, 45 S.Ct. 528, 69 L.Ed. 1041 (1925)). At its inception the courts held that to invoke the marshaling doctrine, there must have been: 1) two creditors asserting claims against a common debtor; 2) two funds belonging to the debtor (the "common debtor requirement"); and 3) one creditor with a legal right to satisfy its debt from either of the funds while the other creditor had rights in only one of the funds. *Morris v. Jack B. Muir Irrevocable Trust (In re Muir)*, 89 B.R. 157, 160 (Bankr.D.Kan.1988).

■ In its inception, marshaling was traditionally applied in cases where two secured creditors, one senior to the other, held claims to a single item of collateral. At the insistence of the junior secured creditor, courts, in equity, required the senior secured creditor to proceed first against the collateral in which it had a separate secured interest. Where marshaling was allowed the court was to consider the rights of all those with an interest in the property, including the debtor, and apply the doctrine "only when it can be equitably fashioned as to all of the parties." *Meyer*, 375 U.S. at 237, 84 S.Ct. 318. Marshaling was not imposed if doing so unduly burdened or prejudiced any party. *Whittaker Corp. v. St. Cloud Nat'l Bank (In re St. Cloud Tool & Die Co.)*, 533 F.2d 387, 391 (8th Cir.1976). The party seeking to force a creditor to marshal had to show that marshaling would not impose an undue hardship on the senior lienholders. *See Herzog v. NBD Bank*, 203 B.R. 80, 83 (N.D.Ill.1996).

■ Defendants' tax liens attached to the property when Debtor was in title and remained on the property after the Debtor transferred his interest to JoAnna. *See United States v. Stutsman County Implement Co.*, 274 F.2d 733 (8th Cir. 1960). As JoAnna Bame was the sole owner of record when the Debtor's bankruptcy proceeding commenced, there is no common debtor for the two sources of payment to satisfy the marshaling doctrine's common debtor requirement. Rather, in seeking to have this court order

marshaling on behalf of unsecured creditors, the Trustee depends on the much more expansive law with respect to marshaling in the Eighth Circuit. In the Eighth Circuit the doctrine of marshaling is more broadly applied as an equitable remedy in bankruptcy cases to provide an equitable distribution of assets to creditors. As a court of equity, this court applies the doctrine of marshaling based on federal and Minnesota law, when the equities of the case so require. *See C.T. Dev. Corp. v. Barnes (In re Oxford Dev. Ltd.),* 67 F.3d 683, 686–87 (8th Cir.1995); *Berman v. Green (In re Jack Green's Fashions for Men Big & Tall, Inc.),* 597 F.2d 130, 133 (8th Cir.1979).

In the absence of a common debtor, marshaling has been held to be appropriate in bankruptcy proceedings to achieve an equitable result. Courts have applied marshaling where a shareholder has treated the debtor corporation as an alter ego, allowing for the piercing of the corporate veil. *See Fundex Capital Corp. v. Balaber–Strauss (In re Tampa Chain Co.),* 53 B.R. 772, 778 (Bankr.S.D.N.Y.1985). Marshaling has also been used, in the absence of a common debtor, where a debtor or its shareholder may have engaged in inequitable conduct which harms creditors. *See, Jack Green's,* 597 F.2d at 133.

In *Jack Green's,* the Eighth Circuit first articulated this rule.[3] There the court held that marshaling was appropriate to force a secured creditor to collect its debt from collateral pledged to it, not by the corporate debtor, but by principals of the corporate debtor to support their guarantees. The court was not troubled either by the fact that marshaling was being ordered for the benefit of unsecured, rather than junior secured, creditors, nor by the absence of a common debtor. *Id.* Marshaling of assets refers to the equitable power of a court to require a creditor with two discrete sources of payment to exhaust the one specified by the court before seeking repayment from the other in order not to defeat another creditor who can collect only from one fund. *Meyer,* 375 U.S. at 236, 84 S.Ct. 318.

In this circuit, this much more expansive view of marshaling was subsequently applied to force a secured creditor to marshal once again against assets not owned by the Debtor. *In re Laeupple,* 87 B.R. 74, 75 (Bankr.W.D.Mo.1988):

This Court ... would still be completely comfortable in applying marshaling in every instance where there was any showing of any of the indicia of undercapitalization, alter ego, overreaching, or any type of misconduct on the part of the debtors, or the owners, or the senior lien holder. This Court reads the *Green* decision to mean that where refusal to marshal allows the parties who have caused the loss to the junior creditors to escape with substantial assets or to tip toe from the scene of the economic debacle hand in hand with the senior lienholder, bankruptcy courts are permitted to exercise their equitable power to reduce the loss to the general creditors. It may well be that *Green, supra,* blurs the ancient requirements of two funds—each being property of an identical common debtor as assorted commentators

---

**3.** The *Jack Green's* case has been criticized in a number of cases and articles. *See e.g.* Jeffrey B. Sklaroff, *Marshaling of Assets,* 348 PLI/Comm, May 1, 1985, at 429; *Peoples Bank v. Computer Room, Inc. (In re Computer Room),* 24 B.R. 732 (Bankr.N.D.Ala.1982); *In re Corso Stein Enterprises, Inc.,* 79 B.R. 584 (Bankr.D.N.J.1987). The criticism is inappropriate where the third party acknowledges, by a settlement with the Trustee, that the debtor retained a sufficient interest in the property to warrant the payment of the liens from the proceeds of a sale.

have stated. Nevertheless this Court believes that it not only enunciates a more modern view—attuned to the realities of today—but indeed serves the intent and purposes of bankruptcy and its equitable considerations.

*Id.*

■ Here, the Trustee has come forward with probative evidence showing that equitable grounds exist for requiring the Defendants to marshal the federal and state tax claims. Within less than a year of his bankruptcy, the Debtor transferred his interest in the property, his residence containing a million dollars or more in equity, to his wife, JoAnna, to shield equity in the property from the creditors' claims. She has agreed to pay the tax liens from the proceeds of sale of the property. Marshaling will prevent Debtor and his wife from preserving some of the equity in the property for themselves at the expense of unsecured creditors. *See In re Laeupple* 87 B.R. at 75; *cf. In re Field, Jr.,* 226 B.R. 178, 183 (Bankr.D.S.C.1998)(declining to compel marshaling of assets of nondebtor spouse who did not engage in equitable conduct).

3. Marshaling In This Case

In this case, Defendants do not quarrel with the proposition that marshaling is a possible remedy under the facts of this case. Rather, they make two principal claims. First, Defendants assert that the equitable doctrine of marshaling cannot, as a matter of public policy, be applied to governmental entities. Second, they assert marshaling would impose an undue burden upon them, foreclosing application of the doctrine.

a. Marshaling Against Government Entities

The IRS cites *Silverstein v. United States (In the Matter of Ackerman II),* 424 F.2d 1148 (9th Cir.1970) and *Internal Revenue Service v. Valley Nat'l Bank (In re Decker),* 199 B.R. 684, 688 (9th Cir. BAP 1996) for the proposition that "a junior lienholder cannot invoke the marshaling doctrine to prevent the United States from enforcing its tax liens" and that a contrary holding would be a substantial burden on the government. *Ackerman II,* 424 F.2d at 1150 (citations omitted). However, neither the MDOR nor the IRS has shown that any substantial burden exists on the government which offsets the equity achieved by marshaling.[4] Additionally, the Trustee in this case, unlike the creditors in *Ackerman* and *Decker,* is not seeking to prevent the IRS or the MDOR from enforcing tax liens, but to require them to seek collection from the property first.

■ I disagree with the proposition put forth by the IRS and the MDOR that "[t]here is no right for marshaling against the United States." *United States v. Eshelman,* 663 F.Supp. 285, 288 (D.Del.1987) (citations omitted). Applying marshaling to the IRS and MDOR is within the authority of the bankruptcy courts as part of the claim allowance process as well as being a proceeding that affects the liquidation of assets of the estate. *See* 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(O). The Bankruptcy Code itself creates barriers and burdens upon the taxing authorities that hinder their ability to collect taxes in the Code's attempt to create an equitable distribution of assets between creditors. *See, e.g.* 11 U.S.C. §§ 362, 724. Marshaling is merely a mechanism to reach that goal. The Trustee is seeking this remedy

---

**4.** The IRS also cites *United States v. Herman,* 310 F.2d 846, 848 (2d Cir.1962), but the court in Herman summarily found marshaling was an undue burden to the United States without discussion of the extent or nature of the burden.

as a matter of equity in an attempt to maximize the estate for the benefit of all creditors. *See Oxford Dev.*, 67 F.3d at 686 (marshaling is a "purely equitable" doctrine "and will be enforced only when it is equitable to do so."). Under the appropriate circumstances the IRS and the MDOR may be required, as a matter of equity, to marshal if all other elements of marshaling are present. *See Maine Assocs. v. United States (In re Morahan)*, 53 B.R. 489, 492 (D.Me.1985)(*citing In re Ann Arbor Brewing Co.*, 110 F.Supp. 111, 116 (E.D.Mich.1951)(marshaling principle applied with regard to tax claims)).

### b. Prejudice to Creditor

Defendants would not be unduly prejudiced if required to satisfy their tax claims by judicial foreclosure against the property. The property is a Lake Minnetonka luxury log home with 230 feet of beachfront. The property has been marketed as two separate parcels: a 100 foot lakefront lot for development and the home on the 130 foot lakefront lot. The real estate appraiser testified that, as of October 8, 2001, the appraised value of the home on the 130 foot beachfront lot is $1,800,000 and that the value of the undeveloped lot is $1,000,000, contingent upon the finalization of the subdivision of the two lots. This valuation testimony was not challenged. I therefore find that when marketed in this fashion it has a value of $2.8 million. Even if it were marketed as a single parcel for tear down purposes in order to effect a quick sale, it has a value of $2.5 million.

After payment of the mortgage, fees and expenses, and the homestead claim, substantially more than sufficient equity remains in the property to pay the tax liens in full. As of October 30, 2001, the payoff amount for the Bank of America mortgage is $1,309,079.64, which includes real estate taxes, late charges and fees. JoAnna is

entitled to a homestead exemption of $200,000. Minn.Stat. § 510.02. The United States estimates the cost of judicial foreclosure and sale would be $10,041; whereas its costs of redemption and sale would be about $1,790. On a worst case scenario if the United States sold the property at fire sale value as a single unit for tear down purposes, it should get $2.5 million for the property. This equity cushion of nearly a million dollars is more than adequate to pay whatever holding costs the United States would incur to maintain the property until it was sold, leaving still a huge equity to return to JoAnna.

The MDOR estimates that it would incur costs of redemption of $247,900 over the Bank of America's mortgage indebtedness of $1,309,080. In its calculation of expenses of $247,000, the MDOR includes additional interest and late charges, mortgage insurance, legal fees, property taxes, and MDOR employee costs, plus the payoff of the United States tax lien of $136,700. Even if the MDOR were to incur all of these estimated expenses, over $800,000 to $1,000,000 of equity would remain in the property after redemption. The MDOR also estimates it would incur a monthly carrying cost from the time of redemption to the date the property is sold of $15,600 per month. If a buyer for the property were not obtained immediately, sufficient equity would remain to cover these additional costs.

The MDOR asserts as an affirmative defense that it is prohibited from enforcing its lien against the property under Minn. Stat. § 270.69, subd. 10, which states:

A lien imposed under this section upon property defined as homestead property in sections 510.01 and 510.02 may not be enforced against homestead property by levy under section 270.70, or by judgment lien foreclosure under chapter 550, but notwithstanding section 510.07, is

enforceable against the proceeds from the sale, conveyance, or transfer of the homestead.

MINN. STAT. § 270.69, subd. 10. By definition, "the value of the homestead exemption, whether the exemption is claimed jointly or individually, may not exceed $200,000." MINN. STAT. § 510.02. Neither the MDOR nor the United States would enforce its lien against the $200,000 of equity which JoAnna Bame could claim as her homestead exemption. Based on the appraised value of $2,800,000, over $1,000,000 of equity would remain in the property to pay tax claims after the payment of the mortgage indebtedness of $1,309,080, the Defendants' total costs of redemption of $250,000, and the $200,000 homestead exemption ($2,800,000 less $1,309,080 less $250,000 less $200,000 equals $1,040,920).

A marshaling order requiring Defendants to first exercise their rights by foreclosing against the property to satisfy their tax liens would cause no undue harm to Defendants. Marshaling would not disrupt the existing rights of the parties in this case. The estate's funds, the Defendants' second potential source for payment, result from the Trustee's administration of the estate for the benefit of unsecured creditors. But for the Chapter 7 bankruptcy proceeding, Defendants would need to foreclose against the property to satisfy the tax liens. Here the Trustee requests that Defendants be required to first exercise their rights against the collateral before seeking payment from the estate's funds. If the equity in the property were not sufficient to cover the mortgage homestead exemption, costs of foreclosure and Defendants' tax liens in full, Defendants could still assert an unsecured or priority claim against the bankruptcy estate and be paid. *Cf. Bowers v. Norton*, 175 Minn. 541, 222 N.W. 71, 72 (1928)(no marshaling imposed where rights of secured party are impaired); *Broadway Nat'l Bank of Chelsea v. Hayward*, 285 Mass. 459, 189 N.E. 199, 202 (1934)(no marshaling imposed which would compel senior lienor to litigate with uncertain outcome); *St. Cloud Tool*, 533 F.2d at 390 (no marshaling imposed where collateral had been sold and trustee had abandoned claims to proceeds). Here a marshaling order imposes no risk or undue burden on Defendants and would allow for the equitable treatment of all claims.

## ORDER FOR JUDGMENT

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. Any United States tax lien against the $195,000 in settlement proceeds relating to the Hook 'n Horn Resort is avoided under 11 U.S.C. §§ 545(2) and 551;

2. The Debtor's securities held in the Union Securities, Ltd. account and the settlement proceeds thereof are not subject to any United States tax lien under 26 U.S.C. § 6323(b)(1);

3. The Debtor's securities held in the Union Securities, Ltd. account and the settlement proceeds thereof are not subject to any Minnesota Department of Revenue tax liens;

4. No Minnesota Department of Revenue tax lien attached to the Hook 'n Horn Resort or to the $195,000 settlement proceeds relating to the Resort.

5. The United States must satisfy its tax claims against the bankruptcy estate as set forth in Proof of Claim No. 19 by proceeding first against the property located at 5110 Meadville, Greenwood, Minnesota, in which it has a lien;

6. The Minnesota Department of Revenue must satisfy its tax claims against the bankruptcy estate as set forth in Proof of Claim No. 35 by proceeding first against

the property located at 5110 Meadville, Greenwood, Minnesota, in which it has tax liens.

LET JUDGMENT BE ENTERED ACCORDINGLY.