In re XYZ OPTIONS, INC., Debtor.

Donald L. DIONNE, Plaintiff,

v.

FIRST ALABAMA BANK and XYZ Trading Co., Inc., Defendants.

Bankruptcy No. 94–70883–TBB–7. Adversary No. 96–00314.

United States Bankruptcy Court, N.D. Alabama, Southern Division.

Jan. 29, 1998.

Jerry W. Schoel, Birmingham, AL, for Plaintiff.

Robert P. Reynolds, Tuscaloosa, AL, for Regions Bank.

William R. Murray, Northport, AL, for XYZ Trading Co., Inc.

### Memorandum Opinion

THOMAS B. BENNETT, Bankruptcy, Judge.

Convolution envelops that which is basic in the fog of complexity. It also delays, sometimes prevents, travel to one's desired destination. Lifting of the fog and resumption of a journey is the focus of this opinion.

*I. The Itinerary: The Voyage Charted, The Shoals, Salvage, And The Mooring*

Donald L. Dionne, the trustee of the chapter 7 bankruptcy estate of XYZ Options, Inc. ("Trustee"), seeks partial summary judgment against First Alabama Bank, now known as

Regions Bank ("Regions Bank"), and XYZ Trading, Co., Inc. ("Trading") to control by marshaling the disposition of collateral securing repayment of certain debts. Some were owed to Regions Bank and one is allegedly owed to the Trustee.

The Trustee's marshaling demand is predicated on Alabama's codification of this equitable doctrine. It is set forth in Ala.Code § 35–11–4 (1991).[1] The Trustee's demand involves sundry transactions associated with (i) two parcels of real property, (a) lots 5 and 5A located on the Ono Island Harbor Peninsula in Baldwin County, Alabama ("Ono Island Property") and (b) 5201 Reichhold Road, Tuscaloosa, Alabama ("Reichhold Road Property"), and (ii) a certificate of deposit. What the Trustee wants is the certificate of deposit applied to reduce debts of Trading in a fashion which increases the amount of proceeds from sale of the Ono Island Property available to pay monies claimed to be owed to the Trustee. Intertwined with the order of liquidation of properties sought by the Trustee are credit transactions involving Trading and William H. Muscarella.

Multiplicity of the pre-bankruptcy transactions of parties other than the debtor joined with the debtor's post-petition acquisition of an interest in the real properties which form a basis for the Trustee's demand causes marshaling on superficial examination to appear to be warranted. It is not. To comprehend the inapplicability of marshaling necessitates an analysis and understanding of the credit transactions upon which the Trustee grounds his marshaling theories. Once this occurs, just why the Trustee's argument navigates onto a shoal in the passage selected surfaces: the unavailability of one of the funds mandated for marshaling.

Although marshaling is not a proper basis by which the Trustee recovers monies for the bankruptcy estate of XYZ Options Inc. ("Options"), its denial is not the end of the voyage to recovery. Another principle—that of a foreclosing mortgagee holding surplus sale funds for inferior lienholders—allows the Trustee's transport to be salvaged and the resumption of his journey to recover the surplus from the foreclosure sale of the Ono Island Property. Despite the continuation of the Trustee's voyage, the award of monies to him may not yet be made. This is due to the Trustee's craft having to moor at the dock of want of evidentiary fact: how much, if any, monies of the asserted common debtor are owed to the Trustee.

## II. The Sextant Without Which The Voyage May Not Be Navigated: Timing Of The Demand

■ Time is of the essence when marshaling is sought. To be timely, the Trustee must have made a written demand before one of the properties for which marshaling is sought—here the Ono Island Property—was sold. See Ala.Code § 35–11–4 (1991); *Vines v. Wilcutt*, 212 Ala. 150, 102 So. 29 (1924); *Turner v. Flinn*, 67 Ala. 529 (1880); *see also Cent. Lumber Co. v. Jacks*, 222 Ala. 475, 132 So. 721 (1931). Why a timely demand is required is rudimentary. One seeking to have a secured creditor sell or liquidate one property or fund against which the secured creditor holds a lien before the disposition of another property or fund against which the secured creditor and other creditors have liens, that is to marshal, cannot obtain the desired result once this other property or fund has been sold or otherwise liquidated.

In this case, a serious issue exists over the Trustee's compliance with the timely, written demand requirement. The Trustee asserts

1. Since the Trustee designated Ala.Code § 35–11–4 (1991) as the basis for his marshaling claim, an examination of the federal court application of marshaling under the Bankruptcy Code may appear to be unwarranted. With one possible exception, there would be no significant difference in the result reached by either's application. *Compare C.T. Dev. Corp. v. Barnes (In re Oxford Dev.)* 67 F.3d 683, 686 (8th Cir.1995) *with Peterson v. Brent Banking Co.*, 514 So.2d 888 (Ala.1987); *Chandler v. Kyle*, 176 Ala. 184, 57 So. 475 (1912). The possible exception has been

adopted by only a few federal courts in a context which pushes marshaling beyond its traditional boundaries. This small number of courts has used certain legal theories to seemingly comply with requisites of marshaling: a common debtor and two funds constituting property of the common debtor. Because the Trustee seeks a similar extension of the scope of transactions to which marshaling is applied, analysis of this variant of marshaling and why it is rejected by this Court is undertaken.

in a pleading the existence of a letter dated after the sale of one of the properties sought to be used as one of the funds necessary for marshaling—the Ono Island Property. The complaint filed to initiate this adversary proceeding may also be a written demand. It, too, is dated after the sale of the Ono Island Property.

Despite the fact that the letter and the complaint are dated after the sale of one of the properties for which marshaling is requested, another occurrence prevents a ruling that the Trustee's demand was untimely. It is an asserted agreement between Regions Bank and the Trustee on what Regions Bank was to do with the Ono Island Property foreclosure sale surplus. It was made before Regions Bank exercised its foreclosure rights against the Ono Island Property.

Due to the manner of disposition of this matter, this Court need not resolve whether the claimed agreement on the handling of the surplus met the statutory requirement of a timely, written demand. For the same reason, no determination is required that its existence overcomes a contention of waiver or other similar defense to marshaling premised on the absence of a timely, written demand necessitated by Ala.Code § 35–11–4 (1991). To resolve this dispute, it is enough that the existence of a timely demand is assumed.

### III. The Navigation Landmarks Or The Structure Of The Credit Transactions

#### A. Ono Island

##### 1. The liens

###### a. Regions Bank

The Trustee asserts he holds a mortgage against Trading's Ono Island Property second in priority only to that held by Regions Bank. The bank obtained its first mortgage position to secure repayment of a promissory note executed by Trading on September, 19, 1991, payable in the original principal amount of one hundred sixteen thousand one hundred twelve dollars and eighteen cents

($ 116,112.18) ("Trading–Ono Note"). At the same time, a mortgage was executed by Trading transferring to Regions Bank legal title in and to the Ono Island Property (First Ono Mortgage). William H. Muscarella ("Muscarella") and Richard W. Kendricks ("Kendricks"), each of whom at the time of this transaction were officers of Trading, were guarantors of the Trading–Ono Note.

The Trading–Ono Note contains a provision which sets forth that the Reichhold Road Property is additional collateral securing its repayment. However, in September, 1991, the Reichhold Road Property was owned by Muscarella and Kendricks—not Trading. Muscarella and Kendricks signed the portion of the Trading–Ono Note describing and granting the lien and security interest solely in each's respective capacity as an officer of Trading, the borrower, and not as the owners of the Reichhold Road Property. Also, the First Ono Mortgage does not transfer any interest in or to, nor create any lien against or security interest in the Reichhold Road Property. There has been no evidence tendered of any properly executed and recorded mortgage, deed of trust, or other security granting device giving Regions Bank either legal title to or a valid, perfected lien or security interest in the Reichhold Road Property to directly secure repayment of the Trading–Ono Note.

###### b. The Trustee

Just how the Trustee acquired his asserted lien position against the Ono Island Property has a serpentine origin. A second mortgage against the Ono Island Property was granted by Trading to First Phoenix Capital, Inc., now known as First Alabama Capital, Inc. (hereinafter FAC), on December 13, 1993, (Second Ono Mortgage) to secure repayment of a promissory note payable to FAC in the original principal sum of seventy-five thousand dollars ($75,000) ("Trading–Trustee–Ono Note").[2] On or about October, 1995, as a part of a settlement entered into in the civil action captioned *Dionne v. Muscarella et. al.,* CV–95–AR–0329–W, then pending in the United States District Court for the North-

---

**2.** Although late in this litigation, Trading now disputes how much, if any, of the Trading–Trustee Ono Note remains unsatisfied. For purposes

of resolving only the marshaling demand, the Court has assumed that this note remains unpaid.

ern District of Alabama ("District Court Settlement"), FAC assigned to the Trustee its interest in the Trading–Trustee–Ono Note along with the Second Ono Mortgage.

### 2. *Foreclosure, demand—Arrangement, And Surplus*

On June 14, 1996, following Trading's default under the Trading–Ono Note, Regions Bank held a nonjudicial foreclosure sale on the Ono Island Property. This property sold for approximately two hundred ten thousand dollars ($210,000). The sale proceeds were sufficient to pay in full the Trading–Ono Note which satisfied this Regions Bank obligation and left excess proceeds of fifty-five thousand seven hundred sixty-eight dollars and seventy-six cents ($55,768.76). Unfortunately, the excess proceeds are not enough to pay in full what the Trustee claims is due under the Trading–Trustee–Ono Note. As of May 29, 1997, the Trustee contends it had an unpaid balance including interest of eighty-seven thousand four hundred ninety-three dollars and forty-two cents. ($87,493.42).

Sometime after conclusion of the sale of the Ono Island Property, the Trustee made what may be characterized as some sort of a written demand for marshaling. This occurred no earlier than thirteen days after the foreclosure sale of the Ono Island Property, June 27, 1996. Before the sale of the Ono Island Property, the Trustee alleges that a marshaling related arrangement had been made between the Trustee and Regions Bank to place any residual proceeds above those necessary for payment of foreclosure expenses and the Trading–Ono Note in a certificate of deposit or other account pending the sale of the Reichhold Road Property. Apparently, there is no writing executed by the Trustee and Regions Bank which memorializes this arrangement. Despite the absence of a written agreement, its occurrence has not been disputed by Regions Bank.

Following the sale of the Ono Island Property, Regions Bank informed the Trustee that it was required under Alabama law to apply the Ono Island Property excess sales proceeds in the manner provided in the First Ono Mortgage. Just what Alabama law is relied on by Regions Bank for this position is not mentioned in the letter where it set forth this change in position on disposition of the Ono Island Property foreclosure surplus proceeds. Likewise, no reference has been made to Alabama law or to the mortgage in support of the bank's position.

A review of the First Ono Mortgage details the distribution of foreclosure sale proceeds as agreed to between Trading and Regions Bank. It contains a provision that any monies above those necessary to satisfy the Trading–Ono Note and the costs and expenses of the foreclosure sale are to be applied to repay any other obligations which Trading owed to Regions Bank. Following this use of funds, any monies remaining are to be paid to "the ... Mortgagors or to whomever then appears of record to be the owner of said property."

This mortgage is one of the ilk devised by financial institutions with assistance of counsel to supposedly encompass all permutations of events which may occur in credit transactions repayment of which is secured by real property. At best, verbal descriptions designed to include all variations are frequently imprecise and do not include within the words selected the complete set of possible events which may occur. This is just what has happened here! The mortgage document does not address the impact on the distribution of surplus foreclosure sale proceeds caused by the existence of inferior mortgages, liens, and/or other encumbrances existing as of the time of foreclosure.

### B. *Reichhold Road*

#### 1. *The Lien Creditor And Owner*

Regions Bank obtained a first mortgage against the Reichhold Road Property as collateral to secure repayment of a promissory note in the principal amount of two hundred forty-five thousand dollars ($245,000) ("Muscarella–Reichhold Note"). Both this mortgage and the Muscarella–Reichhold Note were executed by Muscarella and Kendricks on October, 16, 1990. When the Trustee became the owner of the Reichhold Road Property in 1995, it was subject to the pre-existing mortgage rights of Regions Bank.

### 2. The Guaranty, its Collateralization, The Condition

On December 14, 1993, which was after the demise of Kendricks, Trading executed a limited guaranty agreement with Regions Bank under the terms of which Trading guaranteed repayment of a sum not to exceed seventy-five thousand dollars ($75,000) of the amount due and owing under the Muscarella–Reichhold Note ("Trading–Reichhold Guaranty"). Although on its face, the Trading–Reichhold Guaranty document appears to be continuing and unconditional, it was also a limited one which was given to obtain the release of Kendrick's estate from liability under the Muscarella–Reichhold Note.

This guaranty document, too, was another standardized form devised for use in all sorts of guaranty transactions. In addition to guaranty language, the Trading–Reichhold–Guaranty also grants a security interest in a seventy-five thousand dollar ($75,000) certificate of deposit. What confounds that which otherwise would be by its terms an unconditional guaranty are the other two documents executed as a part of and at the same time as the Trading–Reichhold Guaranty: an assignment of a certificate of deposit and an addendum to the assignment. More about these follows.

On the same day Trading guaranteed the Muscarella–Reichhold Note. Regions Bank issued to Trading certificate of deposit # 10144037 ("Certificate of Deposit") in the amount of seventy-five thousand dollars ($75,000) which Trading contemporaneously assigned to Regions Bank by employment of yet one more standardized form of assignment of savings account agreement. This fully secured payment of what was to accrue as Trading's guaranty obligation to Regions Bank when the Muscarella–Reichhold Note was not repaid in full.

The monies used by Trading to acquire the Certificate of Deposit had been obtained by Trading from a loan by FAC, repayment of which was secured by the Second Ono Mortgage. Subsequently and in partial payment for settlement of various claims by the Trustee against it, FAC transferred its interest in the Reichhold Road Property to the Trustee.[3] This transfer was also encompassed in the District Court Settlement.

Now more on the Assignment of Savings Account agreement ("Assignment of Savings Account") and the Addendum to the Assignment of Savings Account ("Addendum"). Both are dated December 14, 1993. As unequivocally evidenced by the terms set forth in the Assignment of Savings Account coupled with the Addendum, Trading pledged the Certificate of Deposit to Regions Bank to secure Trading's limited guaranty of the Muscarella–Reichhold Note.

Unlike the promissory note, the Trading–Reichhold Guaranty, and the Assignment of Savings Account, the Addendum was not another Regions Bank form document. This is how what had been a run of the mill, boiler plate, form document for a continuous, unconditional, limited guaranty became subject to a condition which later was to become determinative of the Trustee's entitlement to marshaling. Trading's guaranty was not just limited in the dollar amount, it was also conditional in another respect. The Addendum modified Regions Bank's security interest granted in (a) the Trading–Reichhold Guaranty, and (b) the Assignment of Savings Account in a manner which also made the Trading–Guaranty conditional.

The condition relevant to this matter is that on default under the Muscarella–Reichhold Note, Regions Bank is restricted by the terms contained in the Addendum to utilize first the proceeds from sale of real estate—the Reichhold Road Property—securing the repayment of the Muscarella–Reichhold Note. Then and only then may the Certificate of Deposit monies be applied to satisfy Trad-

---

**3.** There have been several conveyances of the Reichhold Road Property. It was purchased on October 21, 1988, by Options. In July, 1990, Options transferred this property to Muscarella and Kendricks. Sometime in November, 1993, Muscarella acquired Kendrick's interest in the Reichhold Road Property. Then on December 14, 1993, Muscarella transferred the Reichhold Road Property to FAC. This conveyance to FAC happens to be the (i) day after FAC loaned Trading seventy-five thousand dollars ($75,000) and obtained the Second Ono Mortgage which is now held by the Trustee, and (ii) the same day Trading pledged the Certificate of Deposit to Regions Bank and guaranteed the Muscarella–Reichhold Note.

ing's guaranty obligation. Contractually, once Trading's guaranty of the Muscarella–Reichhold Note and any other indebtednesses of Trading to Regions Bank which were also secured by the Certificate of Deposit have been satisfied, any monies remaining from the Certificate of Deposit are to be paid to Trading.

Discerning just why a condition in the Addendum restricting Regions Bank's use of the Certificate of Deposit to satisfy Trading's guaranty liability also made the guaranty conditional is facilitated by the process of thinking about what had occurred. It makes no sense to prevent Regions Bank from using the Certificate of Deposit monies until after sale of the primary collateral for payment of the Muscarella–Reichhold Note, the Reichhold Road Property, and have a guaranty agreement which is unconditional.

Why this is so is disclosed by what an unconditional guaranty permits to occur. Under an unconditional guaranty, Trading's liability would have accrued on default under the Muscarella–Reichhold Note. *See PR Leasing Co. v. Cowin Equip. Co.,* 611 So.2d 232, 234 (Ala.1992); *O'Neal v. Peaden,* 228 Ala. 21, 151 So. 877, 878 (1933). Under the scenario that Trading's guaranty was unconditional, Regions Bank would have been entitled to demand payment of the guaranty, sue on the guaranty, and take other actions to collect seventy-five thousand dollars ($75,000) from Trading from a source other than the Certificate of Deposit! Should this have been the contracting parties' intention, liability enforcement activities could have occurred at a time when Regions Bank was barred by

contract from using the Certificate of Deposit to satisfy this guaranty liability.

When the Trading–Reichhold Guaranty, Assignment of Savings Account, and Addendum are treated as one agreement, as they were obviously intended by the parties to be, the intent of Regions Bank and Trading was to make the Trading–Reichhold Guaranty conditional. This means Trading's liability under it did not accrue until the Reichhold Road Property was sold for a sum less than was owed under the Muscarella–Reichhold Note. *See, e.g., Russell v. Garrett,* 204 Ala. 98, 85 So. 420, 423 (1920); *Manatee County State Bank v. Weatherly,* 144 Ala. 655, 39 So. 988, 989 (1905); *Shur–Gain Feed Div. William Davies Co. v. Huntsville Prod. Credit Ass'n.,* 372 So.2d 1317, 1320 (Ala.Civ.App. 1979). The single best fact supporting that this is what the parties had intended and agreed to is that this is exactly how Regions Bank treated Trading's liability under the guaranty.

### 3. Sale By Trustee

On May 29, 1997, the Trustee sold the Reichhold Road Property for two hundred fifteen thousand dollars ($215,000). The net proceeds after sales commissions and taxes amounted to one hundred ninety-five thousand two hundred fifty-eight dollars and eighty-four cents ($195,258.84). These have been paid to Regions Bank. This sum was insufficient to pay of lithe Muscarella–Reichhold Note which, as of April 30, 1997, aggregated with interest two hundred fifty-three thousand eight hundred eleven dollars and forty-seven cents ($253,811.47).[4]

---

**4.** Before the sale of the Reichhold Road Property, Regions Bank had internally applied the proceeds from the Ono Island Property foreclosure remaining after payment of the Trading–Ono Note to the indebtedness due and owing under the Muscarella–Reichhold Note. Regions Bank asserts this resulted in Trading receiving a dollar for dollar reduction against its guaranty. Fifty-five thousand seven hundred sixty-eight dollars and seventy-six cents ($55,768.76) were applied to the Muscarella–Reichhold Note and Trading's guaranty was reduced to nineteen thousand two hundred thirty-one dollars and twenty-four cents ($19,231.24).

Although no evidence has been presented on the issue of why Regions Bank used the Ono Island Property foreclosure surplus in the man-

ner it did, it is possible Regions Bank realized later that no agreement between it and Trading allowed it to apply monies of Trading directly against Muscarella's debt on the Reichhold Road Property. The only potential options Regions Bank had under the contracts was to apply the Ono Island Property foreclosure sale surplus proceeds to pay against or hold as further security for Trading's guaranty of the Muscarella–Reichhold Note. The problem with this is that at the time of sale of the Ono Island Property there is no evidence that Regions Bank had made a demand for payment of Trading's guaranty liability. This was due to the fact that the condition to accrual of the guaranty liability—sale of the Reichhold Road Property—had not occurred, and the guaranty was and always had been fully secured by the Certificate of Deposit! Without

## IV. The Demand's Courses And The Statutory Channel

### A. The Marshaling Sought

#### 1. Course 1

In the initial version of the demand for marshaling, the Trustee desired that Regions Bank (i) first apply the Certificate of Deposit monies pledged to secure Trading's guaranty of the Muscarella–Reichhold Note wholly to the indebtedness of Trading owed on the Ono Island Property, and (ii) next have the Ono Island Property foreclosure sale proceeds disbursed to Regions Bank to satisfy the First Ono Mortgage indebtedness with any residual sum paid to the Trustee. If this were to occur, the Certificate of Deposit would reduce what was owed to Regions Bank by approximately seventy five thousand dollars ($75,000) and increase the monies available to pay the second mortgage held by the Trustee by the identical amount. After sale of the Reichhold Road Property by the Trustee for less than what was owed to Regions Bank, the Trustee changed his professed application of Certificate of Deposit funds.

#### 2. Course 2

Since the foreclosure sale of the Reichhold Road Property, the Trustee has sought to allow Regions Bank to apply fifty-three thousand five hundred eight-seven dollars and sixty-four cents ($53,587.64) of the Certificate of Deposit monies to satisfy the unpaid balance of the Muscarella–Reichhold Note. Remember, it is the sale of the Reichhold Road Property for an amount less than

owed to Regions Bank which triggered Regions Bank's ability to use the Certificate of Deposit for payment of Trading's guaranty liability! On complete satisfaction of the Muscarella–Reichhold Note, any residual Certificate of Deposit monies, by now as much as slightly over thirty-two thousand dollars ($32,000), are sought by the Trustee to reduce the amount of the Trading–Ono Note before application of the foreclosure sale monies.

#### 3. Course Iterance

More simply and in the most recent version of the marshaling request, the Trustee wants what Trading pledged to primarily secure repayment of Trading's guaranty of the Muscarella–Reichhold Note—the Certificate of Deposit—used to pay the deficiency under the Muscarella–Reichhold Note and then what is left to be applied to reduce the pre-foreclosure unpaid balance owed by Trading under the Trading–Ono Note. This would increase the monies available from sale of the Ono Island Property for satisfaction of the note held by the Trustee by as much as approximately thirty-two thousand dollars ($32,000) more than the actual surplus. This demand was made despite the already completed sale of the Ono Island Property for a sum greater than that owed to Regions Bank.

If allowed, the Trustee would achieve a result which exhausts all of Trading's Certificate of Deposit monies. The Trustee would be able to obtain under the Second Ono Mortgage all of the remaining proceeds from

some intervening action such as a demand by an inferior lienholder for the foreclosure sale surplus or this suit, this state of affairs left Regions Bank with the First Ono Mortgage option of paying the surplus monies to the mortgagor or to the party appearing of record to be the owner of the Ono Island Property. Here, that would have meant paying the surplus to Trading.

After the Reichhold Road Property was sold at foreclosure, the bank reversed its internal application of the Ono Island Property excess sale proceeds. As will be apparent later in this opinion, what Regions Bank did after this reversal is closer to what the law recognizes should have occurred in the first place. It put the Ono Island Property excess sales proceeds into a certificate of deposit in the Trustee's and Trading's name It then liquidated Trading's Certificate of Deposit to apply against the post-foreclosure unpaid bal-

ance due under the Muscarella–Reichhold Note. Fifty-three thousand five hundred eighty-seven dollars and sixty-four cents ($53,587.64) of the Certificate of Deposit monies were applied to satisfy Trading's guaranty of the Muscarella–Reichhold Note. Following this application of funds, the amount of Certificate of Deposit monies remaining plus accrued interest aggregated approximately thirty-two thousand six hundred ninety-four dollars and sixty-three cents ($32,694.63). Why fifty-five thousand seven hundred sixty-eight dollars and seventy-six cents ($55,768.76) of surplus from the Ono Island Property foreclosure were initially paid against the Muscarella–Reichhold Note and later only fifty-three thousand five hundred eighty-seven dollars and sixty-four cents ($53,587.64) from the Certificate of Deposit were used for the same purpose has not been explained to the Court.

the foreclosure sale of the Ono Island Property which would be enhanced by that portion of the Certificate of Deposit monies retained by Regions Bank: at least fifty-five thousand seven hundred sixty-eight dollars and seventy-six cents ($55,768.76), plus up to a little more than thirty-two thousand dollars ($32,000). This achieves approximately the same result as that sought by the Trustee under his initial proposal that all Certificate of Deposit monies be used to first pay down Trading's debt to Regions Bank on the Ono Island Property and then have the surplus foreclosure sale proceeds paid to the Trustee.

### B. The Longitude And Latitude Of The Statutory Channel

The basis for each version of the marshaling request is Ala.Code § 35–11–4 (1991). In pertinent part, it provides

[w]here one has a lien upon different things, and other persons have subordinate liens upon, or interests in, some but not all of the same things, the person having the prior lien, *if he can do so without risk of loss to himself, or of injustice to other persons,* must resort to the property in the following order, on the written demand of any person interested:

(1) To the things upon which he has an exclusive lien;

(2) To the things which are subject to the fewest subordinate liens. . . .

Ala.Code § 35–11–4 (1991) (emphasis added). This places into statutory form the doctrine of marshaling as it had been developed by the Alabama courts. *Peterson v. Brent Banking Co.,* 514 So.2d 888 (Ala.1987). It is a doctrine which is rooted in equity. *Meyer v. United States,* 375 U.S. 233, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963); *Chandler v. Kyle,* 176 Ala. 184, 57 So. 475 (1912).

█ "[The right to marshal securities] is confined to cases where two or more persons are creditors of the same debtor, and have successive demands upon the same property, the one prior in right having other securities." *Chandler,* 57 So. at 476. For example, "[i]f A. has a right to go upon two funds, and B. upon one, having both the same debtor, and *the funds are the property of the same person,* A. shall take payment from that fund to which he can resort exclusively,

so that both may be paid." *Chandler,* 57 So. at 476 (emphasis added); *see also Meyer* 375 U.S. at 237, 84 S.Ct. at 321; *Peoples Bank of Tuscaloosa v. The Computer Room, Inc. (In re The Computer Room, Inc.),* 24 B.R. 732, 734 (Bankr.N.D.Ala.1982).

█ It is clear under Alabama law that the determination of the propriety of marshaling is to be made by this Court at the point in time when the demand required by Ala.Code § 35–11–4 (1991) occurs. *See, e.g., Cent. Lumber Co. v. Jacks,* 222 Ala. 475, 132 So. 721 (1931); *Vines v. Wilcutt,* 212 Ala. 150, 102 So. 29 (1924); *Turner v. Flinn,* 67 Ala. 529 (1880). See also In Matter of Mills, 40 B.R. 72 (Bankr.E.D.N.C.1984); *Vandever Inv. Co. v. H.E. Leonhardt Lumber Co.,* 503 P.2d 185, 191 (Okla.1972); *Harrington v. Taylor,* 176 Cal. 802, 169 P. 690 (1917) ([E]quity will apply the doctrine [of marshaling] only to conditions existing at the time when it is invoked. It can only become a fixed right by taking proper steps to have it enforced, and until this is done it is subject to displacement and defeat by subsequently acquired liens upon the fund. This inchoate right or equity is not a lien, and is therefore subject to defeat at any time before it is attempted to be enforced.) The Trustee, as the party asserting marshaling, must establish among other factors that at the time of the marshaling request (i) both the Trustee and Regions Bank were creditors of the same debtor, (ii) two or more funds belonging to the common debtor were available, (iii) Regions Bank, but not the Trustee, was able to resort to more than one of these funds, and (iv) marshaling would not cause an injustice to other persons or a risk of loss to Regions Bank. *Computer Room,* 24 B.R. at 734 (Elements to be proven); *Gusdorf & Co. v. Ikelheimer & Co.,* 75 Ala. 148 (1883); *Henderson v. Gold Life Ins. Co.,* 72 Ala. 32, 37 (1882); *Nelson v. Dunn,* 15 Ala. 501, 517 (1849); *see also St. Paul Fire & Marine Ins. Co. v. Fort Vancouver Plywood Co. (In re Brazier Forest Prod., Inc.),* 921 F.2d 221 (9th Cir.1990) (The creditor asserting marshaling bears the burden of proof.).

### V. Shoals On Which Marshaling Founders

The Trustee has a common element in each version of his marshaling demand: use

of the Certificate of Deposit monies to pay down the Trading–Ono Note. In order to accomplish this, the Trustee implicitly assumes that marshaling under Ala.Code § 35–11–4 (1991) may be effectuated by allowing a junior lien creditor (the Trustee) to obtain marshaling of properties securing obligations which are owed by the asserted common debtor (Trading) in different capacities (as borrower and guarantor) and with respect to which the creditor with resort to more than one item of collateral (Regions Bank) has contractually restricted rights regarding when and how one of the items of collateral may be utilized (the Certificate of Deposit). No Alabama or other authority has been recited to this Court in support of such a proposition.

To decide whether marshaling should be ordered to occur, one must do the reverse of that which is subsumed in the Trustee's argument for marshaling—disregard of the status in which the common debtor's obligations are owed and the limits on the creditor's rights against collateral—and analyze his request by determining whether for a common debtor, marshaling is permissible and proper in the equitable sense. An initial inquiry needed is for the purpose of establishing as of the demand time the status of (a) the parties, and (b) the collateral or funds to which two or more creditors of a common debtor may look for repayment. If either the requisite status of parties and/or funds did not exist, no basis for marshaling has been presented.

### A. Oh No Ono!

1. *Trading's Common debtor Status—(i) Trading–Ono Note With The Trading–Trustee Ono Note, And (ii) Trading–Reichhold–Guaranty And Trading–Trustee Ono Note*

Two of Trading's debt transactions involve the Ono Island Property: the Trading–Ono Note and the Trading–Trustee Ono Note. Each was collateralized by a mortgage against the Ono Island Property. As a result of these notes, Trading was a common debtor of Regions Bank and the Trustee at the time of the Trustee's demand for marshaling. Along with Trading's status as having been a common debtor of the Trustee and Regions Bank arising from these debts, Trading also achieved at a later time the required common debtor status. It arose on accrual of its liability as a guarantor of the Muscarella–Reichhold Note obligations owed to Regions Bank. This accrued guaranty liability coupled with Trading's debt to the Trustee secured by the second mortgage against the Ono Island Property also made Trading a common debtor for marshaling. However, this second basis for common debtor status did not exist until after (i) the Trustee's marshaling demand had been made, and (ii) the sale of the Reichhold Road Property for less than what was owed to Regions Bank.

### 2. Expedition For The Fabled Second Fund

Since a common debtor existed as a result of Trading's indebtednesses to the Trustee and Regions Bank, were two funds available to Regions Bank to secure repayment of Trading's obligations owed to it? It is uncontroverted that Regions Bank could apply the Ono Island Property sale proceeds to discharge the indebtedness due and owing under the Trading–Ono Note. What is not clear is whether Regions Bank was entitled to make similar use of the only potential sources of a second fund to repay the Trading–Ono Note: the Reichhold Road Property and/or the Certificate of Deposit.

### a. Reichhold Road Property Companionway

Although the Trading–Ono Note lists and purportedly makes the mortgage granted by Muscarella in the Reichhold Road Property as other and further security for its repayment, the Reichhold Road Property did not collateralize the Trading–Ono Note. When Muscarella and Kendricks signed the Trading–Ono Note, the document was executed by Muscarella and Kendricks in each's capacity of an officer of Trading. It was not signed by either as the owners of the Reichhold Road Property. Since Trading did not own the Reichhold Road Property, its purported transfer of any interest in the Reichhold Road Property to Regions Bank as security for the Trading–Ono Note was and is ineffectual.

Inspection of the Muscarella–Reichhold Note and the mortgage granted by Muscarella to secure its repayment does not alter the result that the Reichhold Road Property never secured repayment of the Trading–Ono Note. The mortgage's explicit provision is that the Reichhold Road Property only further secured obligations of Muscarella and Kendrick owed to Regions Bank—not those of Trading. Based on this and Regions Bank's release of Kendrick's liability under the Muscarella–Reichhold Note, the Reichhold Road Property collateralized first, the Muscarella–Reichhold Note, and on its satisfaction Muscarella's guaranty of the Trading–Ono Note. It did not directly, nor primarily secure Trading's repayment of the Trading–Ono Note.

■ Over and above this fact why the Reichhold Road Property did not constitute a second fund is the status of a guarantor's property for marshaling under the law. Alabama follows the long standing rule that the property of a guarantor is not a fund for marshaling. This means the Reichhold Road Property was not a second fund available to Regions Bank for marshaling. *See Chandler v. Kyle,* 176 Ala. 184, 57 So. 475 (1912); *Moses v. Home Bldg. & Loan Ass'n,* 100 Ala. 465, 14 So. 412 (1893); *see also In re Childers,* 44 B.R. 23, 26 (Bankr.N.D.Ala.1984); *Computer Room,* 24 B.R. at 737.

■ Joined with this is the effect of the sale of the Ono Island Property for more than what was owed to Regions Bank: Muscarella's guaranty of Trading's debt secured by the Ono Island Property was extinguished. *Shur–Gain Feed Div. William Davies Co. v. Huntsville Prod. Credit Ass'n,* 372 So.2d 1317, 1320 (Ala.Civ.App.1979); *see also In re Morris,* 204 B.R. 783, 785 n. 3 (Bankr. N.D.Ala.1996). In other words and even if a guarantor's property constituted a second fund for marshaling under Alabama law, it no longer was such a fund at the time of the Trustee's demand.

### b. *The Certificate Of Deposit Gangplank*

Due to the invidious appropriation by (i) a provision in the Trading–Ono Note that any future deposit by Trading with Regions Bank would also secure repayment of the Trading-

Ono Note, and (ii) language to similar effect set forth in the Assignment of Savings Account, the Certificate of Deposit also secured repayment of the Trading–Ono Note. This, alone, does not make it a second fund for marshaling purposes.

### (i) *The Restriction*

■ Despite the other indebtedness clause in the Assignment of Savings Account and the Trading–Ono Note which made the Certificate of Deposit also secure repayment of the Trading–Ono Note, it could not be considered a second fund for marshaling. This is because Trading and Regions Bank expressly agreed to limit when and how the Certificate of Deposit might be called upon for repayment of Trading's debts owed to Regions Bank: only after sale of the Reichhold Road Property for an amount insufficient to pay off the note secured by this real estate. Since this condition had not been satisfied at the time of the Trustee's demand, the Certificate of Deposit was not a second fund.

That it is this contractual agreement between Trading and Regions Bank which precluded the Certificate of Deposit from being a second fund available to Regions Bank for marshaling is disputed by the Trustee. However, Alabama law is contrary to the Trustee's position.

### (ii) *Allowed By Case Law And Provided For By Statute*

■ Alabama is "especially conservative in its application of the doctrine of marshaling assets ..." as exhibited by refusing to allow marshaling in circumstances when it is applied by other jurisdictions. *See Peterson v. Brent Banking Co.,* 514 So.2d 888, 890 n. 1 (Ala.1987). At common law, the parties to a contract could delineate the priority in which assets could be liquidated to satisfy one's debts. *See, e.g., Gusdorf & Co. v. Ikelheimer & Co.,* 75 Ala. 148 (1883). These agreements were valid, enforceable, and precluded marshaling. *See Boykin v. First State Bank of Comanche,* 61 S.W.2d 126 (Tex.Civ.App. 1933); *see, e.g., Platte Valley Bank of North Bend v. Kracl,* 185 Neb. 168, 174 N.W.2d 724 (1970).

Although it has imposed a restriction on such agreements, the Alabama Supreme Court in its *Gusdorf & Co. v. Ikelheimer & Co.* opinion recognized their enforceability. *Gusdorf & Co. v. Ikelheimer & Co.*, 75 Ala. 148 (1883). The facts on which the *Gusdorf* opinion was based are different from those of this case. After the debtor and an existing lien creditor knew of a levy which resulted in another creditor obtaining a lien against the debtor's property, the debtor and the existing lien creditor agreed on the order in which the debtor's property should be disposed of to pay off the debt owed to the existing lien creditor. The scheme agreed to had the effect of and apparently was designed to prevent the subsequent lien creditor from enforcing his lien against the debtor's property.

■ The Alabama court in *Gusdorf* held only that such an agreement made after notice or knowledge of a subsequent creditor's levy was unenforceable against such a levying creditor. It did not hold unenforceable all agreements between a debtor and a creditor defining when and under what conditions collateral may be used to repay a secured debt. Indeed, it is implicit in the Alabama Court's opinion and analysis that just such agreements are valid and to be enforced so long as they are not entered into after knowledge of levy or other lien with the purpose of preventing enforcement. *Gusdorf & Co. v. Ikelheimer & Co.*, 75 Ala. 148 (1883).

This is not what occurred in this Trustee–Trading –Regions Bank matter. The Trustee has never held a lien against the Certificate of Deposit and the Addendum portion of the terms of the agreement on Trading's guaranty could not preclude the Trustee from collecting monies from the value of an asset against which he did not have a lien. This is an underpinning for why the *Gusdorf* limitation does not apply to this marshaling dispute. It is not the only foundation for the conclusion that Alabama law recognizes and enforces such agreements.

It is buttressed by another portion of Alabama law which developed and co-existed with the doctrine of marshaling. Thought

about the condition placed on the guaranty reveals that another case law developed equitable doctrine supports this Court's ruling. The Addendum portion of the agreement to guaranty does this: it requires that Regions Bank sell the primary obligor's (Muscarella's) property securing repayment of the Muscarella–Reichhold Note before it may resort to the guarantor's (Trading's) property securing satisfaction of the guaranty. What Trading and Regions Bank have done by contract is that which courts of equity in Alabama and elsewhere have allowed to take place even when not provided for by contract. It is a practice embodied in what has been known as the doctrine of exoneration: "the exoneration of the surety's or guarantor's liability by the invocation of equity to compel the principal debtor to satisfy the demand or liability for which the surety [or guarantor] stood responsible." *Bramlett v. Kyle*, 168 Ala. 325, 52 So. 926, 927 (1910).

■ The Supreme Court of Alabama's opinion in *Bramlett* delineates that the doctrine of exoneration may be incorporated into a contract or obtained by recourse to a court sitting in equity. Exoneration enables the surety or guarantor to invoke the power of a court of equity to control and direct a mortgagee's or other secured creditor's power of sale to satisfy the primary obligor's debt. It includes directing the sale of the primary obligor's asset before that of the surety or guarantor. *Bramlett*, 52 So. at 927. This is precisely what Regions Bank and Trading did by contract as part of Trading's agreement to guaranty the Muscarella–Reichhold Note.

Not to be overlooked is the enactment of exoneration by the Alabama legislature as a portion of the Code of Alabama 1975: Ala. Code § 8–3–13 (1993). Although the statutory version has certain exceptions not relevant to this Court's holding, it allows a surety to require a creditor to bring an action against the principal debtor before resort may be had against the surety and his property.[5] Furthermore, Ala.Code § 8–3–13 (1993)'s enactment did not abrogate the case law devel-

---

**5.** The definition of surety as used in Ala.Code § 8–3–13 (1993) includes a guarantor. *Cf: MJM,*

*Inc. v. Cas. Indem. Exch.*, 481 So.2d 1136, 1139 (Ala.1985).

oped doctrine of exoneration. *Howle v. Edwards*, 97 Ala. 649, 11 So. 748 (1892). It therefore supplements the equitable doctrine.

The impact of Alabama's case law developed doctrine of and statute for exoneration is that Trading could have sought either's use and potentially obtained that which it had already contractually secured. Not only does this establish that the condition of Trading's guaranty obligation restricting use of the Certificate of Deposit is allowed under decisions of Alabama's courts, it also displays that such agreements are not contrary to the laws enacted in Alabama.

### (iii) The Statutory Injustice To Others

#### (a) Alabama

■ Ala.Code § 8–3–13 (1993) is not the only statute evidencing that conditioning of Trading's guaranty is in accord with the laws of this state. Since Ala.Code § 35–11–4 (1991) is a codification of marshaling as it was developed by Alabama case law, Trading and Regions Bank were not prevented by the marshaling statute from conditioning when and under what circumstances the Certificate of Deposit was to be used to satisfy Trading's guaranty. As developed by the Alabama courts, marshaling is not to be used where it causes injustice or an inequitable result. *See Chandler v. Kyle*, 176 Ala. 184, 57 So. 475, 476 (1912). This complement of marshaling was incorporated into the Ala.Code § 35–11–4 (1991) phrase "without ... injustice to other persons ..." It is this provision which assimilates into Ala.Code § 35–11–4 (1991) these case law developed restrictions on marshaling.

■ To utilize marshaling to avoid what was an essential element upon which Trading agreed to guaranty Muscarella's debt to the bank would frustrate without a justifiable rationale the restriction on use of the Certificate of Deposit. In fact, guarantors who seek such limits on a creditor's recourse against their property would frequently not guaranty another's debt if they knew courts could later disregard such restrictions and conditions. For this reason, it would be inequitable and an injustice to Trading to after the fact dishonor the condition on when the guaranty liability was to arise and when the Certificate of Deposit could be used to satisfy the matured guaranty liability.

As applied to this Trading–Trustee dispute, one where the Trustee is a mortgagee, avoidance of the contracted for condition would not only be unjust and inequitable to the guarantor. Any holding allowing the condition on use of collateral securing the guaranty to be avoided by invocation of marshaling may result in harm to others, including creditors of the guarantor, when it is allowed without some sort of egregious conduct by a guarantor, for instance fraud, mandatorily coupled with evidence that its disallowance is not unjust or inequitable and does no harm to others, especially creditors of the guarantor or other third party.[6] in the absence of such evidentiary fact before this Court, any other method of applying marshaling outside the boundary where Alabama courts currently permit its utilization would not be in accord with the principles of equity upon which this doctrine has been developed.

### (h) The Extrapolation

Although not highlighted by the Trustee, what he seeks to do under the guise of the traditional doctrine of marshaling is far from its customary Alabama application. Rather, it is akin to, yet arises in a different factual context from, what a singular group of federal courts has condoned.

This group has not heeded certain of the equitable delimitations of marshaling. In specific factual contexts, these federal courts have extended marshaling's grasp by allowing property of a guarantor or other third party to be marshaled with that of a common debtor. To bring the facts of the situation

---

**6.** This approach is for use when the Trustee is a bona fide holder of a lien or other security interest. It should not be applied when he is considered a hypothetical lienholder by resort to § 544(a) of the Bankruptcy Code, 11 U.S.C. § 544(a), as has been done by courts in opinions, such as *In re Jack Green's Fashions for Men—Big & Tall, Inc.*, 597 F.2d 130, 131–132 (8th Cir. 1979); *Fundex Capital Corp. v. Balaber-Strauss (In re Tampa Chain Co)*, 53 B.R. 772, 777–778 (Bankr.S.D.N.Y.1985); *In re Multiple Serv. Indus., Inc.*, 18 B.R. 635, 636 (Bankr.E.D.Wis. 1982); *Farmers & Merchants Bank v. Gibson*, 7 B.R. 437, 439 (Bankr.N.D.Fla.1980), *vacated sub. nom. Peacock v. Gibson*, 81 B.R. 79 (N.D.Fla. 1981).

into those historically mandated before a court of equity authorizes marshaling, this body of federal case law requires fraud to have occurred, the existence of detrimental reliance by creditors of the debtor caused by conduct of a third person, a determination that the third party is the alter ego of a common debtor, or the piercing of a corporate veil before permitting marshaling of the third party's property along with that of the debtor. *See e g., In re Jack Green's Fashions for Men—Big & Tall, Inc.,* 597 F.2d 130 (8th Cir.1979); *Fundex Capital Corp. v. Balaber–Strauss (In re Tampa Chain Co),* 53 B.R. 772 (Bankr.S.D.N.Y.1985); *In re Multiple Serv. Indus., Inc.,* 18 B.R. 635 (Bankr. E.D.Wis.1982); *Farmers & Merchants Bank v. Gibson,* 7 B.R. 437 (Bankr.N.D.Fla.1980), *vacated sub. nom. Peacock v. Gibson,* 81 B.R. 79 (N.D.Fla.1981). It is by these methods that these courts have made the third party one and the same as the debtor, i.e. met the common debtor prerequisite, and/or treated the property of the third party a fund for marshaling, that is the second fund needed before marshaling may occur.

Alabama courts have not emulated this questionable practice and this Court has not located a reported opinion of a federal court applying Alabama law where this practice has been followed. One Alabama bankruptcy court has intimated that it might follow this rationale when instances of fraud or other compelling equitable grounds are presented. *In re Childers,* 44 B.R. 23, 26 (Bankr. N.D.Ala.1984). It did not, however, adopt the *Jack Green–Multiple Services Industries–Gibson–Tampa Chain* rationale to expand marshaling's scope. *Id.*

What the Trustee is arguing under Alabama's statute is for an extension of the use of marshaling to reach property not available by adherence to certain of marshaling's prerequisites developed by courts of equity over an extended time frame. He wants property marshaled to pay a debt before another for which it had been previously pledged. The factual difference between what the Trustee seeks and what the extrapolating courts have allowed is that the Trustee does not desire to use a third person's property for marshaling. This is because two of the properties which

are candidates as sources of funds for marshaling are property of the common debtor, Trading.

Despite this fact variance, the Trustee's demand for marshaling requires implementation by use of property as the second fund which is not directly, nor primarily securing a debt of the common debtor. This is precisely what the extrapolating courts have permitted to occur. Coupled with this is the Trustee's and the extrapolating courts' use of other legal doctrines and the application of a court's equitable powers to permit marshaling where the general principles of the equitable remedy of marshaling would not. Due to these similarities between what the Trustee desires and what those federal courts which have trajected marshaling over its usual bounds have allowed, this case law is further analyzed to ascertain whether it supports the Trustee's marshaling demand.

Here, the Trustee's desire is to increase monies for the benefit of creditors of the bankruptcy estate of XYZ Options, Inc. With the exception of the Trustee, no evidence demonstrates the absence of other creditors of Trading. Likewise, no facts demonstrate that others, including existing, other creditors of Trading, would not be harmed by disregard for the restriction on when Trading's guaranty obligation accrued and the use of the Certificate of Deposit. A review of the opinions of the extrapolating federal courts discloses no evidence or discussion of the impact on such other persons caused by the taking of a guarantor's or other third party's property to marshal ahead of that of the primary obligor's. *See, e.g., In re Jack Green's Fashions for Men—Big & Tall, Inc.,* 597 F.2d 130 (8th Cir.1979); *Fundex Capital Corp. v Balaber–Strauss (In re Tampa Chain Co),* 53 B.R. 772 (Bankr.S.D.N.Y. 1985); *In re Multiple Serv. Indus., Inc.,* 18 B.R. 635 (Bankr.E.D.Wis.1982); *Farmers & Merchants Bank v. Gibson,* 7 B.R. 437 (Bankr.N.D.Fla.1980), *vacated sub nom. Peacock v. Gibson,* 81 B.R. 79 (N.D.Fla.1981).

It is the failure to observe the no harm to others criterion which is an error in the holding of the few federal courts which have extended marshaling into the frontier where the common debtor status and one of the

funds for marshaling do not exist unless resort is had to fraud, piercing of corporate veil, alter ego, or contribution to capital. Without consideration of the effect on creditors of a guarantor or third party whose property is marshaled along with those of the primary obligor, an injustice may be caused and an inequitable result may occur. The most obvious case is where creditors of such a third party extend credit based on knowledge of and on the understanding that the conditional nature of a guaranty such as that in this case will not result in the property being used in whole to satisfy what was an obligation second to that of the primary obligor. Until, that is, after the primary obligor's property is used first.

This Court recognizes that piercing the corporate veil and alter ego theories, if successfully used, treat the primary obligor and the guarantor or other third party as the same person/entity. This does not alter the conclusion that before another's property may be used under an equitable doctrine such as marshaling that the principles which evolved to restrict when it may be applied should be followed. The injustice to others and inequitable result limits on marshaling are not done away with by resort to piercing of a corporate veil or similar alter ego theory. Again, review of those federal court's opinions which adopt these theories in order to use property of an otherwise third person for marshaling does not disclose consideration was given to the consequence on other persons, especially other creditors of these third parties, of the marshaling of the sale or other disposition of this property. Rather, the attention is given to the harm and/or benefit to the creditors of the bankruptcy estate. *See, e.g., Jack Green's Fashions for Men—Big & Tall, Inc.,* 597 F.2d at 132; *Tampa Chain Co.,* 53 B.R. at 777; *In re Multiple Serv. Indus., Inc.,* 18 B.R. 635 (Bankr.E.D.Wis.1982); *Gibson,* 7 B.R. at 441.

Instead of this, a court seeking to use an equitable doctrine should do something different and in accord with what equity requires. If piercing the corporate veil or an alter ego theory is the basis to extend marshaling, are not holdings based on these essentially treating both the debtor entity and the third party as one and the same? This being what occurs, a court applying marshaling must observe the requirements for and the restrictions on its use. These restrictions include injustice, harm to others, and inequity. To do this, a court must consider the impact of marshaling on others, including creditors of *both* the bankruptcy estate and the erstwhile third party. Only after concluding no injustice, harm, or inequitable result will be the product of resort to piercing the corporate veil or an alter ego theory to comply with the essential element that a common debtor exist should marshaling be ordered.

So too for the contribution to capital approach and the fraud justifications for the extrapolation. In each instance to make what is not otherwise property of a debtor available to pay his/her/its creditors by justification through reference to the impact of the non-debtor's conduct on the debtor's creditors without regard for the outgrowth of the same actions on the non-debtor-third party's creditors is, if not more, myopic. It may harm in inequitable, unjust, and grievous ways these other creditors in the name of a court of equity's desire to apply an equitable doctrine.

Even when the equity, harm, and justice factors are examined to determine the effect of marshaling on these others, a further qualification is necessary. Use of fraud, piercing of corporate veil, alter ego, or capital contribution to invoke marshaling should not occur when marshaling is sought by a trustee who obtained the mandated lien status by reliance on the hypothetical lien creditor provisions of § 544 of the Bankruptcy Code, 11 U.S.C. § 544. In this case, the Trustee does not rely on § 544 to achieve his subordinate lienholder/encumbrancer status. The same is not true for the extrapolating courts.

In *Jack Green, Tampa Chain, Multiple Services Industries,* and *Gibson,* the trustee did not hold a junior lien or other encumbrance against property of a common debtor. What occurred in these bankruptcy contexts was the expansion of marshaling to accommodate increasing what

is available to a bankruptcy estate for the benefit of the unsecured creditors. *See, e.g., Jack Green's Fashions for Men—Big & Tall, Inc.,* 597 F.2d at 132; *Tampa Chain Co.,* 53 B.R. at 777; *Multiple Serv. Indus., Inc.,* 18 B.R. at 635–636; *Gibson,* 7 B.R. at 441.[7] However, the ramifications of the expedient utilized to achieve the sought after end are not recognized or appreciated. One is use of a doctrine to obtain monies for unsecured creditors when it was designed to protect interests of subordinate *secured* creditors. In other words, use of marshaling for a purpose for which it had never been intended or designed. The next is that in the process of achieving this goal, these courts fail to follow what marshaling demands when they do not consider the injustice, harm or inequitable result which may be imposed on creditors of third parties whose property is being marshaled. It is these factors which cause this Court to reject this extrapolation of marshaling as support for what the Trustee of Options seeks.

Thus, the conclusion of this Court is premised on marshaling's fundamentals. These mandate that until the primary obligation for which the Certificate of Deposit had been pledged was satisfied or otherwise extinguished, it did not exist as a second fund for marshaling purposes. An exception not present in this case may be when the guarantor and creditor agree that the collateral securing the guaranty may also be used by the creditor in connection with any other debt of the guarantor owed to the creditor without regard to whether the guaranteed debt is then due and payable.

*(iv) Afterwards Or On Top Of The Law, Injustice, And The Extragolation—The Sale Eliminates Regions Bank's Status As A Creditor*

After the sale of the Reichhold Road Property and use of a portion of the Certificate of Deposit monies pledged to secure Trading's guaranty of the Muscarella–Reichhold Note, the result remains that the Certificate of Deposit is not a second fund. The reason why this is so is different: the guaranty liability of Trading was extinguished and no other liability of Trading to Regions Bank remained. *Shur–Gain Feed Div. William Davies Co. v. Huntsville Prod. Credit Ass'n,* 372 So.2d 1317, 1320 (Ala.Civ.App. 1979); *see also In re Morris,* 204 B.R. 783, 785 n. 3 (Bankr.N.D.Ala.1996). This means an essential ingredient for marshaling did not exist at the time of the Trustee's modification of his marshaling demand. Regions Bank did not possess a right to—more particularly a lien or security interest in or against—the remaining monies from the Certificate of Deposit. It also was no longer a creditor of Trading. At this later point in time, no common debtor to which one creditor may resort to two funds existed. Regardless of which version of the Trustee's demand for marshaling is analyzed, the Certificate of Deposit was not a second fund for marshaling to repay Trading's debt to Regions Bank.[8]

---

**7.** Whether a Trustee of a bankruptcy estate may use his or her 11 U.S.C. § 544 hypothetical lien status to meet Ala.Code § 35–11–4 (1991)'s mandate that the person seeking marshaling hold a lien against the common debtor's property is not addressed.

**8.** Another potential basis for marshaling existed. The Ono Island Property sale proceeds surplus are a fund for marshaling with respect to the Trading–Reichhold–Guaranty. Why this is so further convolutes an already overly complex set of facts: it is once more the result of the other indebtedness language embodied in the mortgage securing the Trading–Ono Note which provides that the Ono Island Property additionally secures other existing and/or future obligations due to Regions Bank by Trading. Trading's guaranty of Muscarella's debt to Regions Bank under the Muscarella–Reichhold Note is just such an other

and further obligations of Trading to Regions Bank.

At the time of the marshaling demand, the Ono Island Property had been sold. This meant that the primary obligation for which the Ono Island Property acted as collateral had been satisfied and proceeds from the sale were available for use in connection with the Trading–Reichhold Guaranty. Regions Bank also had the Certificate of Deposit which fully collateralized the Trading guaranty. Therefore, Regions Bank had two funds to look to satisfy Trading's conditional obligation under its guaranty of the Muscarella–Reichhold Note. Since the Trustee does not request marshaling of the surplus proceeds from the Ono Island Property to apply them to Trading's guaranty obligation for the obvious reason that its use may take away monies otherwise available to pay on Trading's Second Ono Mort-

### VI.   More On Oh No!

#### A.   The Risk Of Loss Course Correction

█ Even with a common debtor and should two funds of the common debtor exist, another already mentioned restriction on marshaling must not be present. It is not to occur where its use poses a risk of loss to the senior lien holder. Ala.Code § 35–11–4 (1991).

At that time of the Trustee's demand, the Reichhold Road Property had not been sold at foreclosure and the condition of the guaranty agreement delineating when the Certificate of Deposit monies might be employed to pay against the Muscarella–Reichhold Note had not been fulfilled. If at the time of the Trustee's initial demand Regions Bank had been required to liquidate the Certificate of Deposit and apply the monies to the indebtedness evidenced by the Trading–Ono Note, the potential of a risk of loss to the bank would have arisen. This is because the Reichhold Road Property might not have sold for an amount sufficient to extinguish the obligation which Trading had guaranteed—the indebtedness reflected by the Muscarella–Reichhold Note. Indeed, passage of time in this case proved the risk to be more than a mere possibility. It existed: the Reichhold Road Property sold for less than the unpaid balance due Regions Bank under the Muscarella–Reichhold Note.

This risk of loss to Regions Bank strengthens the holding that marshaling is not apt in this case. It is an equitable curb contained in Alabama's and the general case law development of marshaling which circumscribes its use. S. Lotman & Son, Inc. v. Southeastern Financial Corp., 288 Ala. 547, 263 So.2d 499 (1972); see also Shedoudy v. Beverly Surgical Supply Co., 100 Cal.App.3d 730, 161 Cal.Rptr. 164 (1980). It is this decisional law developed restraint on marshaling's applica-

gage, the Court will not further consider marshaling in this context.

9. Alabama law is that a third party to an agreement may not raise a violation of public policy as a defense to its enforcement. Generally, only parties connected to the agreement may contend that the it is void and unenforceable. See Marx v. Lining, 231 Ala. 445, 165 So. 207, 210 (1935). In light of the facts of Gusdorf, supra, where a

tion which has been embodied in Ala.Code § 35–11–4 (1991) by its "without risk of loss to himself. . ." wording.

### VII.   The Nonexistent Lifeboat Off The Shoal—Why Public Policy Does Not Avoid The Contracted For Restriction On Use Of The Certificate Of Deposit

According to the Trustee, the Addendum should be excluded from the Court's analysis because it is void as being against some Alabama public policy.[9] Just what public policy is asserted to be violated has not been articulated. The Court surmises that the aspect disliked is the restriction on when and how the Certificate of Deposit could be used to satisfy Trading's obligation to the bank.

As this Court has already determined, the Addendum, the Assignment of Savings Account, and the Trading–Reichhold Guaranty are not to be read in isolation from each other. Rather, they are multiple documents which are to be read together to ascertain the terms of the guaranty and its collateralization.

#### A.   If Violated, No Guaranty And No Second Fund

Once one recognizes that the Addendum along with the Assignment of Savings Account and the Trading–Reichhold Guaranty are integral parts of one agreement to guaranty, an error becomes apparent in the Trustee's argument predicated on the syllogism that all agreements which prevent marshaling are against public policy and void, the Addendum is such an agreement, and, therefore, it is void. As an integral part of the overall agreement to guaranty, the Addendum may not be avoided without the concomitant result that the guaranty agreed to by Regions Bank and Trading is void in its entirety. Should this be allowed to occur, there would be no Certificate of Deposit collateralizing Trading's guaranty and the second fund on which the Trustee based his

third party successfully challenged the enforceability of a contract on other grounds, Alabama's general rule appears to have exceptions. Since the Court resolves the Trustee's public policy assertion on another basis, it does not address whether the Trustee is one of those third parties excepted from the Marx v. Lining holding on standing.

marshaling demand would not have been present. More simply, the Trustee may not void just a portion of an agreement to guaranty, that set forth in only the Addendum, to the exclusion of the terms contained in the Trading–Reichhold Guaranty and the Assignment of Savings Account. All or none of the guaranty is void. *See Youngblood v. Bailey,* 459 So.2d 855, 860 (Ala.1984); *Booker T. Washington Burial Ins. Co. v. Roberts,* 228 Ala. 206, 153 So. 409 (1934). The outgrowth of either is that the Trustee does not have a second fund to marshal.

### B. Burden Not Met

Another reason dispatching the Trustee's contention that the Addendum is against a public policy of Alabama is that the party bearing the burden of persuasion, the Trustee, has failed to present sufficient justification for holding that the condition of the guaranty set forth in the Addendum violates a public policy. All that has been presented is an argument. The Trustee as the one desiring to restrain Regions Bank's and Trading's freedom of contract is required to make it plainly and obviously clear that the Addendum set forth condition of the guaranty is against public policy. *Couch v. Hutchinson,* 2 Ala.App. 444, 57 So. 75, 77 (1911). This the Trustee has not done.

### C. Search For A Public Policy

■ Should this Court concede for argument purposes that the Trustee has presented a sufficient predicate for assertion of a public policy argument necessitating consideration of its merits, the Trustee still does not prevail. Why this is the case mandates an initial consideration of what public policy, if any, exists and how, if at all, it has been contravened.

■ As part of the initial consideration, one must keep in mind that public policy is a legal concept simple in conceptualization, yet chameleon like and amorphous in embodiment. Also "there is no fixed rule by which to determine what contracts are repugnant to it. The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests." *Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 356, 51 S.Ct. 476, 477, 75 L.Ed. 1112 (1931).

■ Determination of the existence of a public policy of Alabama inherent in its marshaling statute requires a review of Alabama's constitution, laws, and judicial decisions as well as applicable principles of law. *Higgins v. Nationwide Mut. Ins. Co.,* 50 Ala.App. 691, 282 So.2d 295 (1973), *aff'g.* 291 Ala. 462, 282 So.2d 301; *Couch v. Hutchinson,* 2 Ala.App. 444, 57 So. 75 (1911); *see also Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 356, 51 S.Ct. 476, 477, 75 L.Ed. 1112 (1931).

An examination of the Alabama Constitution of 1901 does not demonstrate the existence of a public policy incorporated in marshaling as codified by Ala.Code § 35–11–4 (1991). Scrutiny of the initial act codifying marshaling in 1923 does not disclose a stated public purpose or the legislative intent behind the statute. Code 1923 § 8938; 1923 Ala. Acts 160. Review of the statute's wording discloses that it is designed in certain instances, not all, to protect interests in property subordinate to those held by another. This is a policy, but whether it is one within the ambit of the category called public policy is not resolved by reference to the statute's words.

Alabama decisional law is an added reference from which this Court may assay whether there is a public purpose embodied in the marshaling statute which is violated by the condition placed on the use of the Certificate of Deposit monies. As a codification of the equitable doctrine of marshaling as it existed before its enactment, Alabama court opinions also reflect that the statute's purpose is to protect the interests of a junior lien holder or other junior interest. *Peterson,* 514 So.2d at 888–889; *see also Booker v. Booker,* 225 Ala. 626, 144 So. 870 (1932) ("The principle of marshaling assets had its origin in the desire of the chancellor to protect junior creditors...."). This is plainly a policy of the statute and it is beyond dispute that it is mutable and not absolute. Ala. Code § 35–11–4 (1991) sets forth restrictions on marshaling's use just as the case law holdings which it codified. Ala.Code § 35–11–4 (1991); *see also Chandler v. Kyle,* 176

Ala. 184, 57 So. 475 (1912). It is this statute's terms and its equitable derivation which make it not apply in all circumstances which evidence that the statutory policy behind marshaling may not be one fitting into the category of "public policy." This issue need not be resolved. For even if it does, it has not been violated in this case.

■■■ The test under Alabama law for determining if a contract is unenforceable on public policy grounds "is 'whether the public interest is injuriously affected in such substantial manner that private rights and interests should yield to those of the public.'" *Colston v. Gulf States Paper Corp.*, 291 Ala. 423, 282 So.2d 251 (1973); *Anderson v. Blair*, 202 Ala. 209, 80 So. 31, 33 (1918) ("Stated with a view to the field in which lies the contract under consideration, the rule of public policy condemns agreements which tend injuriously to affect the public service.") A case law established method which somewhat assists in determining if a contract may be avoided on public policy grounds is those (i) that are specifically prohibited by law, (ii) the enforcement of which violates the law, or (iii) the making of which abrogates laws enacted for regulation and protection as opposed to one solely for revenue purposes are void and unenforceable. *Marx v. Lining*, 231 Ala. 445, 165 So. 207, 209–210 (1935).

Since this Court has already concluded that the "without risk of loss" and "injustice to other persons" limits on marshalings application incorporated into Ala.Code § 35–11–4 (1991) coupled with the condition on use of the Certificate of Deposit precludes marshalings use in this case, this Court's rationale why this is so applies with equal potency to demonstrate that the condition on the use of the Certificate of Deposit to satisfy Trading's guaranty does not violate, nor abrogate any Alabama law, and that it is not prohibited by law. Repetition of explanation of reasons is unwarranted. It is sufficient to state that conditions to a contract coming within (i) Alabama's case law decisions' allowance, *see, e.g., Gusdorf*, 75 Ala. at 156, and (ii) its statutorily prescribed qualifications, those of Ala.Code § 35–11–4 (1991), may not be avoided by a claim of violation of public policy. Also, a contract provision which is allowed by

a common law developed equitable doctrine, exoneration, and by a statute with similar effect, Ala.Code § 8–3–13 (1993), does not violate any Alabama public policy. *See, e.g., Platte Valley Bank of North Bend v. Kracl*, 185 Neb. 168, 174 N.W.2d 724 (1970).

Based on these factors, the agreement concerning the use of a guarantor's property in the fashion embodied by the Addendum is not violative of, or otherwise contrary to public policy of the state of Alabama. Indeed, the Trustee's against public policy argument succumbs to the Alabama codified qualifications to marshaling set forth in Ala. Code § 35–11–4 (1991), Alabama case law upholding such conditions on use of guarantor's property, and to the statutory and case law developed doctrine of exoneration.

*VIII. The Salvage*

*A. No Right To The Access Chosen*

■■■ Unlike the rhythmic crashing of waves on the shore, the Trustee's multiple arguments for marshaling and his modification of the demand have not by their recurrent assertion corraded the marshaling principles encompassed by Ala.Code § 35–11–4 (1991). Adherence to these necessitates that this Court recognize that property securing an obligation of a common debtor subject to a condition precluding its use until the occurrence of a specified event may not be counted as a fund for marshaling until the condition has been fulfilled. The drift is the passage chosen—that of marshaling—does not allow the Trustee to obtain monies for the bankruptcy estate of Options.

*B. The Passage Not Selected—Rights Of Inferior Lienholders And of Encumbrancers*

■■■ Although marshaling does not lead to the Trustee obtaining monies claimed to be owed to the bankruptcy estate of Options, another route for recovery of monies for Options' bankruptcy estate may be available. Under Alabama case law, when a mortgagee sells property at foreclosure with respect to which there are no inferior liens or encumbrances and a surplus results, the surplus is to be paid to the mortgagor or his/her/its successor. *Bailey Mortgage Co. v. Gobble-*

*Fite Lumber Co., Inc.*, 565 So.2d 138, 144 (Ala.1990). This is precisely what Regions Bank's First Ono Mortgage provides is to happen.

A different rule sometimes applies when inferior liens or encumbrances are known to be present. When a demand has been made for surplus funds by the inferior lienholder, mortgagee, or other encumbrance holder, the surplus monies are to be paid to the inferior encumbrance holders in the order of time in which each was perfected against the real property. *Bailey Mortgage Co.*, 565 So.2d at 144.

The *Bailey* holding is neither new, nor novel. In Alabama, its lineage dates to the last century. The Alabama Supreme Court held in *Webster & Wilson v. Singley*, 53 Ala. 208, 211 (1875) that

the surplus of the proceeds of sale, remaining in their [the first mortgagee's] hands after satisfaction of their mortgage, was money had and received, belonging *ex equo et bono*, to the subsequent mortgagees. It was recoverable in an action of assumpsit.

* * *

No resort to a court of equity is necessary to compel the appropriation of such money to the satisfaction of his mortgage. The law makes the appropriation.

*Webster & Wilson v. Singley*, 53 Ala. 208, 211 (1875)(emphasis added); *see also Bailey Mortgage Co. v. Gobble–Fite Lumber Co., Inc.*, 565 So.2d 138, 144 (Ala.1990); *Mobley v. Brundidge Banking Co.*, 347 So.2d 1347, 1352–1353 (Ala.1977); *Turner v. Williams*, 235 Ala. 502, 180 So. 95, 99 (1938); *McDuffee v. Collins*, 117 Ala. 487, 23 So. 45, 46 (1898); *Potts v. First Nat'l. Bank of Gadsden*, 102 Ala. 286, 14 So. 663 (1894); *American Mortgage Co. of Scotland. v. Inzer*, 98 Ala. 608, 13 So. 507, 508 (1893).

What is unclear in Alabama is whether a demand by an inferior mortgagee or lienholder is all that is required before the senior mortgagee or lienholder is to pay surplus proceeds to the inferior mortgagee or lienholder. *Compare Potts*, 14 So. at 663; *Webster & Wilson*, 53 Ala. at 211, *with Mobley*, 347 So.2d at 1352; *American Mortgage Co.*,

13 So. at 508. Also, what type of demand suffices, oral, written, or one of more formality such as by lawsuit? Whether more than a simple demand is needed and how much more is not resolved by reference to decisions of Alabama courts.

Examination of Alabama's statutory provisions governing mortgages and foreclosures reveals but one teasing allusion to this conundrum: Ala.Code § 35–11–211(c) (1991) recognizes the rule that following a foreclosure sale a subordinate mechanics, materialmen, or other interest holder in the land, buildings, and interests thereto shall have "such rights in any excess proceeds received by the foreclosing lienholder as provided by law." This provision is a part of the statute dealing with the priority of mechanic's and materialmen's liens vis-a-vis mortgages, deeds of trust, liens and encumbrances perfected before that of a mechanic or materialman. Although Ala.Code § 35–11–211(c) (1991) does not specify just what is "provided by law" and does not assist in resolving the type of demand required, it does reflect that Alabama recognizes the right of an inferior lienholder—in this case a mechanics or materialperson or *other interest holder* —to excess or surplus proceeds from a superior lienholder's foreclosure sale. Ala.Code § 35–11–211 (1990); 1990 Ala. Acts 90–98.

What type of demand is to be given before a subordinate lienholder may be paid surplus proceeds following a foreclosure does not have to be resolved. Across the spectrum of demands, what has occurred in this case is at the extreme constituting the most formalized. Although made in a different legal context, that of marshaling, a demand for the surplus from the Ono Island Property foreclosure sale was made and suit instituted by the Trustee to obtain this surplus. As a result and absent an agreement by and among all claimants to these monies, Regions Bank had to either (i) pay the monies to one or more of the claimants, (ii) interplead the monies, or (iii) retain the monies until this suit is resolved. It elected retention until resolution of this action.

Due to the Trustee's demand paired with his suit against Regions Bank and Trading in which he seeks the surplus monies obtained

by Regions Bank from its foreclosure sale of the Ono Island Property, the Trustee is, if monies remain unpaid under the Trading–Trustee–Ono Note, entitled to the surplus to the extent this note remains due and payable. This the Alabama court's have made clear and its legislature has, at least in part, codified in Ala.Code § 35–11–211 (1991).

What remains to be proven by admissible evidence is to what extent the Trading–Trustee Ono Note remains unsatisfied. If the Trustee is still owed monies repayment of which was secured by the second mortgage against the Ono Island Property, the surplus proceeds from sale of the Ono Island Property may be paid to the Trustee. Should the surplus proceeds from the Ono Island Property foreclosure not fully satisfy the Trading–Trustee Ono Note unpaid balance, the Trustee may also seek to collect any deficiency by obtaining a judgment enforceable against residual monies from the Certificate of Deposit remaining in the hands of Regions Bank.

### IX. *Disembarkation a/k/a/ Conclusion*

Marshaling is not an appropriate passageway for the Trustee to obtain monies for the bankruptcy estate of XYZ Options, Inc. The result is the Trustee's motion for partial summary judgment on his demand for marshaling is denied. This is not the terminus of his voyage to recovery of monies. The course charted has to be changed. For the Trustee to reach his place of disembarkation, he must demonstrate the amount, if any, of monies owed to him by Trading. Until then, the Ono Island Property surplus sale proceeds and the residual Certificate of Deposit monies are to stay in their current port of call: retained in the interest bearing accounts established by Region Bank.